# EXHIBIT A

 

Search for Cases by: Select Search Method...

Judicial Links | eFiling | Help | Contact Us | Print     GrantedPublicAccess **Logoff DAWNJOHNSON**

### 2122-CC01059 - HOLLY HILLS REALTY LLC V PF AT SOUTH GRAND, LLC (E-CASE)

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/Execution |

**Click here to eFile on Case**
Click here to Respond to Selected Documents

Sort Date Entries: ● Descending ○ Ascending    Display Options: All Entries

---

**06/16/2021** ☐ **Jury Trial Scheduled**
     **Scheduled For:** 12/13/2021; 9:00 AM ; MICHAEL FRANCIS STELZER; City of St. Louis

**06/04/2021** ☐ **Summons Issued-Circuit**
     Document ID: 21-SMCC-3213, for PF AT SOUTH GRAND, LLC.

     ☐ **Filing Info Sheet eFiling**
       **Filed By:** JOHN CHRISTOPHE GRELLNER

     ☐ **Pet Filed in Circuit Ct**
     Petition; Ex. 1; Ex. 2; Ex. 3.
       **Filed By:** JOHN CHRISTOPHE GRELLNER
       **On Behalf Of:** HOLLY HILLS RENTALS, LLC

     ☐ **Judge Assigned**

---

Case.net Version 5.14.18      Return to Top of Page      Released 05/29/2021

IN THE CIRCUIT COURT OF ST. LOUIS CITY
STATE OF MISSOURI

| | | |
|---|---|---|
| HOLLY HILLS REALTY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No. |
| | ) | |
| PF AT SOUTH GRAND, LLC | ) | Division |
| | ) | |
| Serve at: Armstrong Teasdale, LLP, Reg. Agt. | ) | |
| 7700 Forsyth Blvd., Suite 1800 | ) | |
| St. Louis, Missouri 63105 | ) | |
| | ) | |
| Defendant. | ) | |

## PETITION FOR BREACH OF LEASE AND GUARANTY

COMES NOW, Plaintiff, Holly Hills Realty, LLC ("Plaintiff" or "Landlord"), by and through undersigned counsel, and for its Petition for Breach of Lease and Guaranty against Defendant PF at South Grand, LLC ("Defendant" or "Tenant"), states as follows:

1.      Plaintiff is a Missouri limited liability company in good standing with its principal place of business in St. Louis City, Missouri.

2.      Tenant a Maryland limited liability company, at all times relevant operating in and around St. Louis City, Missouri.

3.      This dispute arises from a lease agreement for certain commercial real estate located in the City of St. Louis, Missouri, and as such, venue and jurisdiction are proper before this Court.

4.      On or about February 1, 2012, Tenant entered into a lease agreement (the "Lease") with Landlord's predecessor in interest, South Grand, L.L.C., whereby Tenant agreed to lease the commercial real property commonly known as 6155 South Grand Blvd., St. Louis, Missouri 63111

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

(the "Property") from Landlord under the terms specified in the Lease.  A true and correct copy of the Lease is attached hereto and is incorporated herein by reference as **Exhibit 1**.

5.      On or about August 28, 2012, Landlord and Tenant executed a certain First Amendment of Lease (the "Amendment") amending the terms of the Lease as specifically set forth in the Amendment.  A true and correct copy of the Amendment is attached hereto and is incorporated herein by reference as **Exhibit 2**.

6.      Thereafter South Grand, L.L.C. assigned its interest in the Lease to Landlord.

7.      In approximately 2019, Tenant became delinquent in paying rent owed under the terms of the Lease, as amended.

8.      On or about September 23, 2019, Landlord and Tenant entered into a certain Lease Termination Agreement (the "Termination"), a true and correct copy of which is attached hereto and is incorporated herein by reference as **Exhibit 3**.

9.      Under the terms of the Termination Agreement, Tenant agreed to pay to Landlord the sum of Fifty-Five Thousand Dollars ($55,000.00) and to pay "all Minimum Guaranteed Rental, Tenant's Common Area Maintenance Charge, Insurance Escrow Payment, and Tax Escrow Payment…up to and including the Termination Date".  *See,* **Exhibit 3, Section 5**.

10.     Tenant made the initial Fifty-Five Thousand Dollar ($55,000.00) payment owed under Section 5 of the Termination Agreement, but failed to pay the remaining obligations owed under Section 5 of the Termination Agreement.

11.     Landlord made demand upon Tenant to pay the outstanding amounts owed under the terms of the Termination Agreement, but Tenant refused and/or failed to pay such amounts.

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

12.     As a result of Tenant's breach of the Termination Agreement, Landlord is entitled to enforce the terms of the Lease and collect all amounts owed by Tenant after crediting Tenant for the $55,000.00 paid by Tenant.

## COUNT I - BREACH OF LEASE

13.     Landlord restates paragraphs 1 through 12 of the Petition herein by reference.

14.     Landlord fully complied with all obligations owed under the terms of the Lease.

15.     Pursuant to the terms of the Lease, as amended, Tenant agreed to make monthly payments of rent, along with certain additional taxes, insurance, maintenance expenses, late fees and other expenses.

16.     Tenant breached the terms of the Lease by failing to make payment of agreed-upon rent and expenses to Landlord.

17.     After crediting Tenant for sums paid, including the $55,000.00 paid under the terms of the Termination Agreement, Tenant owes an outstanding balance in an amount to be determined at trial.

18.     Under the terms of the Lease, Plaintiff is also entitled to recover its reasonable attorney's fees incurred herein.

WHEREFORE, Plaintiff Holly Hills Realty, LLC prays for judgment against Defendant PF at South Grand, LLC on Count I of its Petition, damages in the amount in excess of Twenty-Five Thousand and 00/100 Dollars ($25,000.00);  Plaintiff's costs expended herein, including attorney's fees; and pre-judgment and post-judgment interest; and such other and further relief as the Court deems just and proper.

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

## COUNT II – BREACH OF TERMINATION AGREEMENT

19.     Pleading in the alternative, Landlord hereby restates and incorporates by reference all allegations set forth in Paragraphs 1 through 18 of Landlord's Petition as if fully set forth herein.

20.     Landlord fully complied with all obligations owed under the terms of the Lease and the Termination Agreement.

21.     Pursuant to the terms of the Termination Agreement, Tenant agreed to make certain payments, including "all Minimum Guaranteed Rental, Tenant's Common Area Maintenance Charge, Insurance Escrow Payment, and Tax Escrow Payment required to be paid by Tenant to Landlord pursuant to the terms of the Lease up to and including the Termination Date". *See,* **Exhibit 3, ¶5**.

22.     Tenant breached the terms of the Termination Agreement by failing to make such agreed payments.

23.     The outstanding amounts owed by Tenant under the terms of the Termination Agreement exceeds Twenty-Five Thousand and 00/100 Dollars ($25,000.00), plus interest.

24.     Under the terms of the Lease, Landlord is entitled to recover its reasonable attorneys' fees and costs incurred herein.

WHEREFORE, Plaintiff Holly Hills Realty, LLC respectfully requests that the Court enter judgment in its favor against Defendant PF at South Grand, LLC, in an amount in excess of Twenty-Five Thousand and 00/100 Dollars ($25,000.00), for its costs and expenses incurred herein, including reasonable attorney's fees, and for such other and further relief as the Court deems just and proper.

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

BERGER, COHEN & BRANDT, L.C.


By:   <u>   */s/ John C. Grellner*         </u>
     John C. Grellner, MBE #50638
     8000 Maryland Ave., Suite 1500
     Clayton, Missouri  63105
     (314) 721-7272  Telephone
     (314) 721-1668  Facsimile
     jgrellner@bcblawlc.com
     Attorney for Holly Hills Realty, LLC

2122-CC01059

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

*Landlord copy*

## STANDARD COMMERCIAL
## SHOPPING CENTER LEASE

### THE STATE OF MISSOURI, CITY OF ST. LOUIS

This lease (the "Lease"), entered into this 1st day of February 20 12, by and between the Landlord and the Tenant hereinafter named.

### ARTICLE I. DEFINITIONS AND CERTAIN BASIC PROVISIONS

1.1 (a) "Landlord": SOUTH GRAND, L.L.C.

(b) Landlord's mailing address: 1000 COLUMBIA CENTRE
COLUMBIA, ILLINOIS  62236

(c) "Tenant":     PF at South Grand, LLC

(d) Tenant's mailing address:    P.O. Box 544
Lutherville, Maryland  21093

(e) Tenant's trade name:     Planet Fitness

(f) Tenant's address in shopping center:
6155 South Grand Blvd., ST. LOUIS, MO  63111

(g) "Premises":  approximately 20,807 square feet in the Building located at 6155 South Grand Blvd., St. Louis, Missouri 63111, computed from measurements to the exterior of the outside walls to the center of interior walls and to be verified by the parties, such premises being shown and outlined on the plan attached hereto as Exhibit A, and being part of the Shopping Center situated upon the property described in Exhibit B attached hereto.  "Shopping Center" shall refer to the property described in Exhibit B together with such additions and other changes as Landlord may from time to time designate as included within the Shopping Center.

(h)  Lease Term: Commencing on the "Commencement Date" as defined in Section 3.2 and ending   120   months thereafter except that in the event the Commencement Date is a date other than the first day of a calendar month said term shall extend for said number of months in addition to the remainder of the calendar month following the Commencement Date.

(i) "Estimated Completion Date":    TO BE DETERMINED

(j) Permitted Use:   Health and Fitness Center, including ancillary services such as tanning, red light therapy  and the sale of retail products

(k)  Minimum Guaranteed Rental:

| MONTHLY MINIMUM GUARANTEED RENTAL | MINIMUM ANNUAL GUARANTEED RENTAL |
|---|---|
| Years 1-5: $13,004.38 | $156,052.50 Annually ($7.50/sq.ft.) |
| Years 6-10: $14,738.29 | $176,859.50 Annually ($8.50/sq. ft.) |

Renewal option: Two (2) five (5) year options.

| MONTHLY MINIMUM GUARANTEED RENTAL | MINIMUM ANNUAL GUARANTEED RENTAL |
|---|---|
| Years 11-15: $16,472.21 | $197,666.50 Annually ($9.50/sq.ft.) |
| Years 16-20: $18,206.13 | $218,473.50 Annually ($10.50/sq. ft.) |

- 1 -

12075710.3 25482/117356 01/31/2012

EXHIBIT

tabbies

1

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

(1) Initial Common Area Maintenance Charge per month under Section 5.3: $1,300.44 ($.75/sq.ft.).

(m) Initial Insurance Escrow Payment per month under Section 12.3: $728.25 ($.42/sq.ft.).

(n) Initial Tax Escrow Payment per month under Section 18.2: $1,907.31 ($1.17/sq.ft.).

(o) Exclusive/Restrictive Use: Landlord agrees not to lease or sell any space in the Shopping Center or on any property contiguous with or connected to the Shopping Center to any health and fitness center, tanning or red light therapy store.

(p) Hours: Subject to approvals by the City of St. Louis, Tenant shall have the right to operate 24 hours a day, seven days per week, 365 days per year, at Tenant's sole discretion.

1.2 The sum of:

| | |
|---|---|
| Initial Minimum Guaranteed Rental | $13,004.38 |
| Initial Common Area Maintenance Charge | 1,300.44 |
| Initial Insurance Escrow Payment | 728.25 |
| Initial Tax Escrow Payment | 1,907.31 |
| Initial Monthly Water Bill | 00.00 |
| Initial Monthly Trash Bill | 00.00 |
| Initial Monthly Payment Total | $16,940.37 |

1.3 Each of the foregoing definitions and basic provisions shall be constructed in conjunction with and limited by reference thereto in other provisions of this Lease.

## ARTICLE II. GRANTING CLAUSE

2.1 In consideration of the obligation of tenant to pay rent and other charges as herein provided and in consideration of the other terms, covenants and conditions hereof, Landlord hereby takes from demised and leases to Tenant, and Tenant hereby takes from Landlord, the Premises TO HAVE AND TO HOLD for the Lease term, all upon the terms and conditions set forth in this Lease.

## ARTICLE III. CONSTRUCTION AND ACCEPTANCE OF PREMISES

3.1 (a) This Lease shall be contingent upon Tenant securing Building Permits from the City of St. Louis within 90 days from Lease execution. If, despite diligent efforts, Tenant shall not have procured all Building Permits within such time, Tenant may terminate this Lease upon written notice to Landlord, in which event neither party shall have further liability to the other. Landlord advises that it has inquired of the City of St. Louis and has been told that a fitness center is a permitted use at the Premises. If this information is not correct, Landlord shall be responsible, at its sole cost and expense, to obtain any and all zoning and land use permits, special exceptions, variances, consents, authorizations and approvals for the use of the Leased Premises as a Planet Fitness center. Any and all federal, state and municipal licensing, health club permits, registrations or approvals, and permits, licenses and approvals other than zoning and land use related permitting are the responsibility of Tenant.

(b) Landlord shall proceed to construct improvements upon the Premises in compliance with the description of "Landlord's Work" in Exhibit C attached hereto, with minor variations as Landlord may deem advisable, and tender the Premises to Tenant. The Premises shall be deemed to be "Ready for Occupancy" when Landlord certifies in writing to Tenant that Landlord has substantially completed Landlord's work, as described in Exhibit C. The term "Substantial Completion", for the purposes of this Section 3.1 and hereinafter, means that all work as described in Exhibit C has been completed and accepted except for minor adjustments. If the Premises are not ready for occupancy prior to the Estimated Completion Date, Landlord shall not be deemed to be in

- 2 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

default hereunder or otherwise liable in damages to Tenant, nor shall the term of this Lease be affected, except that if for any reason within the control of the Landlord, the Premises are not Ready for occupancy within three (3) months following the Estimated Completion Date, then Tenant may at its option terminate this Lease by written notice to Landlord delivered within thirty (30) days following the expiration of such three (3) month period, in which event neither party shall have any further liabilities or obligations hereunder, except that Landlord shall repay to Tenant any prepaid rent or security deposit.

3.2    When the Premises are Ready for Occupancy, Tenant agrees to accept possession thereof and to proceed with due diligence to perform the work described under description of "Tenant's  work" in Exhibit C, all of such work to be performed in compliance with Exhibit C, and to install its fixtures, furniture and equipment.  By initiating Tenant Work in the Premises, Tenant shall be deemed to have conditionally accepted the Premises and to have acknowledged that the Premises fully comply with Landlord's covenants and obligations hereunder.  At the time of initiating Tenant Work in the Premises, Tenant shall give landlord written notice of any incomplete Landlord's Work observed by Tenant; Tenant shall not be deemed to have accepted the Work done by Landlord until Tenant has had an opportunity to inspect Landlord's Work and Tenant shall have been able to have its HVAC contractor test all HVAC units.  Tenant further agrees that, if requested by Landlord, Tenant will furnish Landlord with a written statement that Tenant has accepted the premises and that Landlord has fully complied with Landlord's covenants and obligations hereunder.  Tenant agrees to furnish to Landlord a copy of the Certificate of occupancy from applicable local authorities on or before the Commencement Date.  Landlord shall provide to Tenant copies of all available architectural blueprints and/or drawings of Premises including elevation, site plans, sign criteria and any other relevant documentation to which Landlord has access to which could affect, control or restrict Tenant's occupancy.

3.3    The Commencement Date of this Lease shall be the earlier to occur of (i) 90 days from date that Landlord delivers Possession of the Premises to Tenant in a condition Ready for Occupancy as set forth above, or (ii) the date that Tenant opens for business.  The exact Commencement Date and termination date of this Lease shall be set forth by Landlord in the form of a "Commencement Letter" which shall be delivered to Tenant in counterparts one (1) of which shall be executed by Tenant and returned to Landlord.  Occupancy of the Premises by Tenant prior to the Commencement Date shall be subject to all of the terms and provisions of this Lease excepting only those requiring the payment of rent.  Landlord and Tenant each agree that at the request of either they will, following the Commencement Date, execute and deliver a letter of agreement, acknowledging that Tenant has accepted possession, and reciting the exact Commencement Date and termination date of this Lease.

3.4    From the time of execution of this Lease Tenant shall have the right to conduct pre-opening sales activities at the Shopping Center, which may include the right to maintain the following on the Common Area:  (a) a panel truck with a Planet Fitness logo; (b) an 8' x 40' security office/sales trailer; (c) the right to maintain directional "snipe" signs in the road right of way, (d)  the right to have a "spinner" at the entrance to the parking lot of the Common Area, and (e) a portable sales kiosk.

## ARTICLE IV.  MONTHLY PAYMENT

4.1    Subject to Section 4.2 below (dealing with 12 months free rent to Tenant), the Monthly Payment, as specified in Section 1.2 (inclusive of Common Area Maintenance, Insurance Escrow and Tax Escrow Payments), shall begin to accrue hereunder twelve months after the Commencement Date, and shall be payable in lawful money of the United States to Landlord at the place designated for the delivery of notices to Landlord at the time of payment, without demand and without off-set, abatement, counterclaim or deduction whatsoever.

4.2    The first Monthly Payment, as specified in Section 1.2 (inclusive of Common Area Maintenance, Insurance Escrow and Tax Escrow Payments) shall be due 365 days

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

after the Commencement Date (which 365 days represents an amount of 6 months suspension of base rent and other monetary obligations in compensation for $101,642 of Landlord's contribution towards Tenant's costs in installing permanent improvements to the Premises, plus an additional 6 months suspension of base rent and other monetary obligations after the Lease Commencement Date), and subsequent Minimum Guaranteed Rental payments shall be due and payable on or before the first day of each succeeding calendar month during the Lease term; provided that if the Commencement Date is a date other than the first day of a calendar month, there shall be due and payable on or before such date as Minimum Guaranteed Rental for the balance of such calendar month a sum equal to that proportion of the rent specified for the first full calendar month for which Minimum Guaranteed Rental is due as herein provided, which the number of days from the Commencement Date to the end of the calendar month during which the Commencement Date shall fall bears to the total number of days in such month.

## ARTICLE V. COMMON AREA

5.1    The "Common Area" is the part of the Shopping Center designated by Landlord from time to time for the common use of all tenants, including, among other facilities, parking area, sidewalks, landscaping, curbs, loading area, private streets and alleys, lighting facilities, and other areas and improvements provided by Landlord for the common use of all tenants, all of which shall be subject to Landlord's sole management and control and shall be operated and maintained in such manner as Landlord, in its discretion, shall determine. Landlord reserves the right to change from time to time the dimensions and location of the Common Area as shown on Exhibit A as well as the location, dimensions, identity and type of any building shown on Exhibit A and to construct additional additional stories on existing buildings or other improvements in the Shopping Center, but in no event shall Landlord reduce parking areas or spaces or access to Tenant's Premises. Tenant and its agents, employees, subtenants, licensees and concessionaires, customers and invitees (collectively, the "Tenant Parties") shall have the non-exclusive right and license to use the Common Area as constituted from time to time, such use to be in common with agents, employees, customers and invitees of Landlord, other tenants of the Shopping Center and their customers and respective invitees, and other persons permitted by Landlord to use the same (collectively, the "Landlord Parties"). Tenant and the Tenant Parties will comply fully with all requirements of the rules and regulations which are attached hereto Exhibit D, and made a part hereof as though fully set out herein. Landlord shall at all times have the right to change such rules and regulations or to promulgate other rules and regulations in such manner as may be deemed advisable for safety, care or cleanliness of the Shopping Center and for preservation of good order therein, all of which rules and regulations, changes and amendments will be forwarded to Tenant in writing and shall be carried out and observed by Tenant. Tenant shall further be responsible for compliance with such rules and regulations by all Tenant Parties. Tenant shall not make any use of the Common Areas which shall interfere in any way with the use of the Common Area by others including, without limitation, the Landlord Parties. Landlord may designate specific areas within the Shopping Center or in reasonable proximity thereto in which automobiles owned by Tenant and the Tenant Parties shall be parked. Tenant will furnish Landlord upon request a complete list of license numbers of all automobiles operated by Tenant and the Tenant Parties. If the amount of the Common Area shall be changed or diminished either permanently or temporarily, Landlord shall not be subject to any liability nor shall Tenant or any of the Tenant Parties be entitled to any compensation or diminution or abatement of rent nor shall diminution of such Common Area be deemed constructive or actual eviction, except in no event shall Landlord reduce the amount of parking or parking spaces. Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to prevent the public from obtaining prescriptive rights thereto or to make repairs or alterations, and may do such other acts in and to the Common Area as in its sole judgment may be desirable to improve the convenience or operation thereof. Tenant parking shall be in common with other retail tenants and Tenant and it patrons shall have the non-exclusive right to park through out the Common Area of the Shopping Center on a 24 hour/7 day per week basis. Landlord agrees that no spaces shall be designated exclusive parking for any tenant in the Shopping Center and that all parking shall remain unassigned. Further, the number and width of parking spaces in the Shopping Center shall not be reduced without Tenant's prior written consent.

- 4 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

5.2    Landlord shall construct, at its sole cost and expense, a repaved striped, hard surface parking area on the front and side of the Shopping Center as shown on Exhibit B or in reasonable proximity therein, it being expressly agreed, however, that in addition to the rights reserved to Landlord and Tenant in Section 5.1 above, Landlord may from time to time substitute for any parking area shown on Exhibit B other areas or multi-level parking facilities reasonably accessible to the tenants of the Shopping Center. Upon Tenant's request, Landlord will install additional suitable lighting of the parking area located on the side (not front) of the Building, such that lighting of all parking areas shall be suitable.

5.3    Tenant agrees to pay as an additional charge each month Tenant's Proportionate Share (defined below) of the cost of operation and maintenance of the Common Area (including those listed on Exhibit B) which may be incurred by Landlord in its discretion, and including an allowance in the amount of ten percent (10%) of the total Common Area costs for Landlord's overhead and administrative costs. This Lease is a "net lease", and as such Tenant agrees that Landlord will incur costs of operation and maintenance which are necessary for the effective and efficient operation of the Shopping center which are not specifically set forth in Exhibit E, subject to Tenant's reasonable approval. Tenant agrees that all such costs shall be included in Tenant's Proportionate Share of the cost of operation and maintenance of the Common Area, which shall be computed on the ratio that the total area of the Premises bears to the annual average number of square feet of leasable space within the Shopping center ("Tenant's Proportionate Share"), which is 34,064 square feet as of the date of execution of this Lease. Tenant's Proportionate Share of the estimated cost of operation and maintenance of the Common Area shall be paid by Tenant in monthly installments in such amounts as are estimated and billed by Landlord at the beginning of each twelve (12) month period commencing and ending on dates designated by Landlord, each installment being due on the first day of each calendar month. If at any time during such twelve (12) month period it shall appear that Landlord has underestimated Tenant's Proportionate Share of the cost of operation and maintenance of the Common Area for such twelve (12) month period, Landlord may estimate Tenant's Proportionate Share and may bill Tenant for any deficiency which may have accrued during such twelve (12) month period, or portion thereof, and thereafter the monthly installment payable by Tenant shall also be adjusted. Within one hundred twenty (120) days or such reasonable time thereafter (in Landlord's determination) after the end of each such twelve (12) month period, Landlord shall deliver to Tenant a statement of Common Area costs for such twelve (12) month period and the monthly installments paid or payable shall be adjusted between Landlord and Tenant, and each party hereby agrees that Tenant shall pay Landlord or Landlord shall credit Tenant's account (or, if such adjustment is at the end of the term, pay Tenant), within thirty (30) days of receipt of such statement, the amount of any excess or deficiency in Tenant's Proportionate Share paid by Tenant to Landlord during such twelve (12) month period. Failure of Landlord to provide statement called for hereunder shall not relieve Tenant from its obligation hereunder. The initial Common Area Maintenance Charge, subject to adjustment as provided herein, shall be that amount set out in Section 1.1(L). Tenant shall have the right to an audit of the computation of Common Area Maintenance Charges; if such audit yields a discrepancy of ten percent (10%) or more, the Landlord shall reimburse the cost of such audit.

5.4    Controllable expenses will be capped at five percent (5%) per year, excluding common area utilities, taxes, insurance and snow removal.

## ARTICLE VI. USE AND CARE OF PREMISES

6.1    The Premises may be used only for the purpose or purposes specified in Section 1.1(j) above, and for no other purpose or purposes without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall use in the transaction of business in the Premises the trade name specified in

- 5 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

Section 1(e) above and no other trade name without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall not at any time leave the Premises vacant, but shall in good faith continuously throughout the term of this Lease conduct and carry on in the entire Premises the type of business for which the Premises are leased. Except to the extent Tenant may be prohibited from being open for business by applicable law, ordinance or governmental regulation, Tenant shall have the right to be open for business 24 hours per day, seven days a week, 365 days per year, in Tenant's sole discretion.

6.2     Tenant shall not, without Landlord's prior written consent, keep anything within the Premises for any purpose which in Landlord's insurance carrier's sole discretion increases the insurance premium cost or invalidates any insurance policy carried on the Premises or other part of the Shopping Center.  Landlord acknowledges that the use specified in Section 1.1(j) does not cause an increase in its premium. Tenant shall pay as additional rent, upon demand of Landlord, any such increased premium cost due to Tenant's use of occupation of the Premises.  All property kept, stored or maintained within the Premises by Tenant shall be at Tenant's sole risk.  Landlord or Landlord's representative shall have the right to inspect the Premises at any time for the purpose of disclosing any additional insurance risk.

6.3     Tenant shall not conduct within the Premises any fire, auction or bankruptcy sales, or operate within the Premises a "wholesale" or "factory outlet store", a cooperative store, a "second hand" store, a "surplus" store or a store commonly referred to as a "discount house".  Tenant shall not advertise that it sells products or services at "discount", "cut-prices" or "cut-rate" prices.  Tenant shall not permit any objectionable or unpleasant odors to emanate from the Premises, nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside the Premises or where the same can be seen or heard from outside the Premises or where the same can be seen or heard from outside the building or in the Common Area, not place an antenna, awning or other projection on the exterior of the Premises, nor solicit business or distribute leaflets or other advertising material in the Common Area, nor place a portable sign, nor park any vehicle bearing any form of advertising within public view in the Common Area, nor take any other action which in the exclusive judgment of Landlord would constitute a nuisance or would disturb or endanger other tenants of the Shopping Center or unreasonably interfere with their use of their respective premises, or do anything which would tend to injure the reputation of the Shopping Center.  Notwithstanding the above, upon signing this Lease Tenant shall have the right to maintain the following on the Common Area:  (a) a panel truck with a Planet Fitness logo; (b) an 8' x 40' security office/sales trailer, during the sales period; (c) the right to have a "spinner" at the entrance to the parking lot of the Common Area, (d) the right to maintain directional "snipe" signs along the roadway in front of the entrance to the Shopping Center, and (e) a portable sales kiosk during the sales period.  Landlord grants its approval for the items listed in this paragraph, subject to complying with all applicable laws, ordinances and governmental regulations.

6.4     Tenant shall take good care of the Premises and keep the same free from waste at all times.  Tenant shall keep the Premises and sidewalks, service-ways and loading areas adjacent to the Premises neat, clean and free from dirt, rubbish, insects and pests at all times, and shall store all trash and garbage within the Premises, arranging for the regular pickup of such trash and garbage at Tenant's expense.  Tenant will store all trash and garbage within the area designated by Landlord for such trash pickup and removal and only in receptacles of the size, design and color from time to time prescribed by Landlord.  Receiving and delivery of goods and merchandise and removal of garbage and trash shall be made only in the manner and areas from time to time prescribed by Landlord.  Tenant shall arrange for its own trash removal and Tenant shall not be responsible for any charges for trash removal of other tenants at the Shopping Center or Common Area trash removal. Tenant shall not operate an incinerator or burn trash or garbage within the Shopping Center.

6.5     Tenant shall maintain all display windows in a neat, attractive condition, and shall keep all display windows and exterior electric sign in front of the Premises lighted from dusk until 10:00 PM every day, including Sundays and holidays.

6.6    Tenant shall include the address and identity of its business activities in the Premises in all advertisements made by Tenant in which the address and identity of any similar local business activity of Tenant is mentioned.

6.7    Tenant shall procure, at its sole expense, any permits and licenses required for the transaction of business in the Premises and otherwise comply with all applicable laws, ordinances and governmental regulations.

### ARTICLE VII.  MAINTENANCE AND REPAIR OF PREMISES

7.1
Landlord shall keep the Common Area and the foundation, the exterior walls (except store fronts, plate glass windows, doors, door closure devices, window and door frames, moldings, locks and hardware and painting or other treatment of interior walls) and roof of the Premises in good repair, ordinary wear and tear excepted.  Landlord, at Landlord's sole cost and expense, shall be responsible for any defective construction of the Premises by Landlord.  Further, Landlord, at Landlord's sole cost and expense, shall be responsible for the maintenance, repair and replacement of the Premises, including, without limitation, all systems outside of, but serving the Premises, the roof (including waterproofing membrane), all structural portions of the Premises, roof structures and supports, sprinkler system (including the fire monitoring panel and the testing and inspection thereof), gutters, downspouts, walls, floor slab, flooring (excluding maintenance, repair or replacement due to Tenant's ordinary wear and tear) foundation, canopy, storefront.  Landlord agrees that each HVAC unit will be delivered in good working condition and functioning properly when inspected by the Tenant's HVAC contractor prior to hookup, connection and final inspections.  Landlord agrees to warrant all Units serving Premises for one (1) year.

Any repairs required to be made by Landlord hereunder which are occasioned by the act or negligence of Tenant, its agents, employees, subtenants, licensees and concessionaires, shall be paid for by the Tenant upon demand to the extent not covered by net insurance proceeds paid to Landlord therefor.  In the event that the Premises should become in need of repairs required to be made by Landlord hereunder, Tenant shall give immediate written notice thereof to Landlord and Landlord shall not be responsible in any way for failure to make any such repairs until a reasonable time shall have elapsed after delivery of such written notice.  Landlord's obligation hereunder is limited to repairs specified in this Section 7.1 only, and Landlord shall have no liability for any damages or injury arising out of any condition or occurrence causing a need for such repairs.

7.2    Tenant shall furnish, maintain and replace all electric light bulbs, tube casings, and ballasts for the interior of the Premises (not exterior)..

7.3    Tenant shall keep the Premises in good, clean condition and shall, at its sole cost and expense, make all needed repairs and replacements, including replacements of cracked or broken glass, except for repairs and replacements expressly required to be made by Landlord under the provisions of Section 7.1, Article XIV and Article XV and shall keep all plumbing units, pipes and connections free from obstruction and leaks, and protected against ice and freezing.  Tenant shall be responsible for the cleaning and maintenance of any grease trap serving the Premises and shall enter into, and furnish Landlord a copy of upon request, a grease trap cleaning contract reasonably acceptable to Landlord.  If any repairs, replacements or maintenance required on the part of Tenant hereunder are not accomplished within twenty (20) days after written notice to Tenant from Landlord (subject to extension in the event that such repairs are not reasonably susceptible of effective repair within such period), or, alternatively, in the event that Landlord deems an emergency situation exists requiring immediate repair, replacement, or maintenance, Landlord may at its option, perform such repairs, replacements or maintenance without liability to Tenant for any loss or damage which may result in its stock or business by reason thereof, and Tenant shall pay to Landlord immediately upon demand as additional rental hereunder the cost of such repairs, replacements or maintenance plus fifteen percent (15%) of such cost plus interest at the maximum allowable rate.  At the expiration of this Lease, Tenant shall surrender the Premises in

- 7 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

good condition, reasonable wear and tear and loss by fire or other casualty excepted and shall surrender all keys for the Premises to Landlord and shall inform landlord of all combinations on locks, safes and vaults, if any, in the Premises. Upon move out by Tenant, should the Premises require any repairs which are the responsibility of Tenant hereunder, Landlord shall have the right to make such repairs at Tenant's sole cost.

7.4    Landlord agrees that each air conditioning and heating unit will be delivered in good working condition and functioning properly when inspected by the Tenant's HVAC contractor prior to hookup, connection and final inspections. Landlord agrees to warrant all HVAC Units serving Premises for one (1) year. Subject to the following sentence, routine maintenance of the air conditioning and heating equipment shall be solely the responsibility of Tenant throughout the entire term of this Lease. The Tenant shall be responsible for repairs to the HVAC Units of up to $1,375.00 per year. If replacement of the HVAC Unit becomes necessary the maximum Tenant shall pay for the replacement is Five Thousand and No/100 Dollars ($5,000.00). Landlord acknowledges Tenant's concern that, if one or both units cease to function, extreme heat or cold would cause a significant loss of membership quickly, accordingly, Landlord agrees that after any monetary adjustments have been made under this Section 7.4, Landlord shall repair or replace the failing unit/units or provide the equivalent tonnage in the form of individual units within 15 days of the failure. Any additional expense above the maximum paid by Tenant shall be the responsibility of the Landlord.  Tenant shall, at its own cost and expense, enter into a regularly scheduled preventive maintenance service contract with a maintenance contractor and the contract must be approved by Landlord. The service contract must include all services suggested by the equipment manufacturer within the operation/maintenance manual and must become effective (and a copy thereof delivered to Landlord) within thirty (30) days of the date Tenant takes possession of the Premises. Tenant shall from time to time upon request furnish proof reasonably satisfactory to Landlord that all systems and equipment are being serviced in accordance with the maintenance/service contract. Should Tenant fail to enact such maintenance contract, Landlord may do so in Tenant's behalf, and Tenant shall pay Landlord upon demand such associated costs plus fifteen percent (15%) plus interest at the maximum allowable rate. Within the thirty (30) day period preceding move out by Tenant, Tenant shall have the systems and equipment checked and serviced to ensure proper functions and shall furnish Landlord satisfactory proof thereof upon request.

### ARTICLE VIII. ALTERATIONS

8.1    Tenant shall not make any alterations, additions or improvements to the Premises without the prior written consent of Landlord (such Landlord approval or consent not to be unreasonably withheld, conditioned or delayed), except for the installation of unattached, movable trade fixtures which may be installed without drilling, cutting, or otherwise defacing the Premises. As a condition to granting its consent, Landlord may impose reasonable requirements in addition to any set forth in this Lease, including, without limitation, requirements as to the manner and time for the performance of any such work and the type and amount of insurance Tenant must acquire and maintain in connection therewith. In addition, at Landlord's option, Landlord shall have the right to approve the contractors or mechanics performing the work and require union contractors; to approve all plans and specifications relating to the work; to review the work of Tenant's architects, engineers, contractors or mechanics and to control any construction or other activities being undertaken within the Shopping Center, with all such Landlord approvals or consents not to be unreasonably withheld, conditioned or delayed; and to require correction of the work in instances in which material or workmanship is defective or not in accordance with plans or specifications previously approved by Landlord. Landlord's approval of any plans and specifications shall create no responsibility on the part of Landlord for the completeness, design sufficiency or compliance with all laws, ordinances, regulations, rules and requirements of governmental entities having jurisdiction or compliance with all covenants, conditions, restrictions or other matters affecting title to the Premises. Tenant shall deliver to Landlord for Landlord's files, at Tenant's sole cost and expense, complete copies of all final working drawings and plans and specifications. All alterations, additions, improvements and fixtures (other than unattached, movable trade fixtures) which may be made or installed by either party upon the Premises shall remain upon and be surrendered with the Premises and become the

- 8 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

property of Landlord at the termination of this Lease, unless Landlord requests their removal in which event Tenant shall remove the same and restore the Premises to their original condition at Tenant's expense. Any linoleum, carpeting or other floor covering which may be cemented or otherwise affixed to the floor of the Premises is a permanent fixture and shall become the property of Landlord without credit or compensation to Tenant.

8.2    All construction work done by Tenant within the Premises, including without limitation Tenant's work referred to in Section.3.1, shall be performed in a good and workmanlike manner, in compliance with all governmental requirements, and the requirements of any contract or deed of trust to which the Landlord may be a party and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Shopping Center. Prior to commencement of construction by Tenant, Tenant shall obtain, at Tenant's sole cost and expense, all necessary permits and approvals (including for Tenant's signs) and post same upon the Premises as required. Tenant agrees to indemnify Landlord and defend Landlord and hold it harmless against any loss, liability or damage resulting from such work.

8.3    Tenant agrees that all venting, opening, sealing, waterproofing or any altering of the roof shall be performed by Landlord's roofing contractor at Tenant's expense and that when completed Tenant shall furnish to landlord a certificate from Landlord's roofing contractor that all such alterations approved by Landlord have been completed in accordance with the plans and all improvements, alterations, repairs or other work performed upon under the direction of a general contractor. Tenant further agrees that plans and drawings for installations or revision of mechanical, electrical or plumbing systems shall be designed by an engineer and bear an engineer's seal, such design work to be done at Tenant's expense. Failure to comply with these specifications will result in default of this Lease.

### ARTICLE IX.  LANDLORDS RIGHT OF ACCESS; USE OF ROOF

9.1    Landlord shall have the right to enter upon the Premises at any reasonable time upon prior notice to Tenant for the purpose of inspecting the same, or of making repairs to the Premises or of making repairs, alterations or additions to adjacent premises, or of showing the Premises to prospective purchasers, lessees or lenders, such entry and conduct shall be in a manner so as not to unreasonably disturb the conduct of Tenant's business.

9.2    Use of the roof above the Premises is reserved to Landlord.

### ARTICLE X. SIGNS; STORE FRONTS.

10.1    Subject to the provisions of 10.2 below, Tenant shall not, without Landlord's prior written consent (a) make any changes to or paint the store front; or (b) install any exterior lighting, decorations or painting; or (c) erect or install any signs, banners, window or door lettering, placards, decorations or advertising media of any type which can be viewed from the exterior of the Premises. All signs, decorations and advertising media shall conform in all respects to Landlord's sign criteria. All signs shall be kept in good condition and in proper operating order at all times.

10.2    Tenant shall have the top panel on the newly installed  pylon sign in the center to be erected by Landlord and the size shall be equal to that of Family Dollar.. Tenant shall have the right to install its signage and banners on the exterior of the Premises in the position currently occupied by "Bremen Bank" so long as the surface area is large enough to accommodate the sign as shown in Exhibit "I", which is hereby approved by Landlord. The size of signs and banners on the Premises shall be determined by Tenant, provided that such signage/banners shall not exceed limitations imposed by the city/county and will comply with all applicable codes. Tenant agrees to have erected and/or installed and fully operative on or before the Commencement Date of this Lease all signs in accordance with local code provisions. The signage as depicted on Exhibit "I" attached hereto is hereby approved by Landlord and supersedes any provision of the Sign Criteria set forth in Exhibit "F". The Tenant, upon vacation of the Premise, or the removal or

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

alteration of its sign for any reason, shall be responsible for the repair, painting, and/or replacement of the building facade surface where signs are attached.

10.3    Tenant waives any liability on the part of the Landlord arising out of Tenant's use of a pylon or monument sign and agrees to hold harmless, indemnify and defend Landlord from any loss, cost, damage, liability or expense, including attorney's fees and expenses, arising out of Tenant's use of such sign (such indemnity excluding any construction or work by Landlord on such pylon or monument sign).

10.4    At any time tenant is in default hereunder and such default has remained uncured for at least thirty (30) days, Landlord shall have the right to erect on the Premises signs indicating that the Premises are available for lease.

## ARTICLE XI.  UTILITES

11.1    Landlord agrees to cause to be provided and maintained the necessary mains, conduits and other facilities necessary to supply water, electricity, gas, telephone service and sewerage service to the Premises and the Building, subject to any special provisions contained in Exhibit C. Tenant will be responsible for repairs necessary for lines located in the building for water, sewer, and electricity.  Landlord shall provide separate meters for all of Tenant's required utility services.  Landlord shall pay for all utility hookup fees and permits.  Tenant shall pay for all of its utility usage in the Building.  All Common Area utilities shall be separately metered.

11.2    Tenant shall promptly pay all charges for electricity, water, gas, telephone service, sewage service and other utilities furnished to the Premises and shall promptly pay any maintenance charges therefore.  Landlord may, if it so elects, furnish one or more utility services to Tenant, and in such event Tenant shall purchase such services as are tendered by Landlord, and shall pay upon demand as additional rental the rates established therefor by Landlord which shall not exceed the rates which would be charged for the same services if furnished directly by the local public utility companies.  Landlord may at any time discontinue furnishing any such service without obligation to Tenant other than to connect the Premises to the public utility, if any, furnishing such service.

11.3    Neither Landlord nor Landlord's partners, beneficiaries, nor any company, firm or individual shall be liable to Tenant or any of Tenant's employees, agents, customers or invitees or anyone claiming through or under Tenant, for any damages, injuries, losses, expenses, claims or causes of action, because of any interruption or discontinuance at any time for any reason in the furnishing of any utilities not due to Landlord's acts or omissions; nor shall any such interruption or discontinuance not due to Landlord's acts or omissions be deemed an eviction or disturbance of Tenant's use or possession of the Premises or any part thereof; nor shall any such interruption or discontinuance not due to Landlord's acts or omissions relieve Tenant from full performance of Tenant's obligations under this Lease.

11.4        Tenant agrees to cooperate fully, at all times, with Landlord in abiding by all reasonable regulations and requirements which Landlord may prescribe for the proper functioning and protection of all utilities and services reasonably necessary for the operation of the Center. Landlord, throughout the term of this Lease, shall have reasonable access to any and all utility facilities serving the Shopping Center and located on the Premises and Landlord shall conduct itself in a manner so as to not unreasonably interfere with the conduct of Tenant's business when Landlord needs access to such utilities.

## ARTICLE XII.  INDEMNITY, COMMERCIAL GENERAL LIABILITY INSURANCE AND FIRE EXTENDED COVERAGE INSURANCE

12.1    To the extent not expressly prohibited by law, Tenant (the "Indemnitor") agrees to defend, hold harmless and indemnify the Landlord, the Landlord Parties, and the Landlord's partners, shareholders, officers and directors (collectively, the "Indemnitees") from any losses, damages, judgments, claims, expenses, costs and liabilities imposed

- 10 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

upon or incurred by or asserted against the Indemnitees, including reasonable attorney's fees and expenses, for death or injury that may arise from or be caused directly or indirectly by any negligent act or omission, or commission of any willful misconduct, of the Indemnitor or any of the Indemnitor's respective agents, partners, or employees. Such third parties shall not be deemed third party beneficiaries of this agreement. In case any action, suit or proceeding is brought against any of the Indemnitees by reason of any such act of the Indemnitor or any of the Indemnitor's respective agents, partners or employees, then the Indemnitor will, at the Indemnitor's expense and at the option of said Indemnitees, by counsel approved by said Indemnitees, resist and defend such action, suit or proceeding. The provisions of this Section shall survive the termination of this Lease with respect to any claims or liability occurring prior to such termination.

12.2    Tenant shall procure and maintain throughout the term of this Lease, at its sole cost and expense, (i) a policy of commercial general liability insurance insuring both Landlord and Tenant against all claims, demands or actions arising out of or in connection with Tenant's use or occupancy of the Premises, or by the condition of the Premises, the limits of such policy or policies to be in an amount not less than Two Million Dollars ($2,000,000) in respect of injuries to or death of any one person, and in an amount not less than Two Million Dollars ($2,000,000) in respect of any one occurrence or disaster, and in an amount not less than Two Million Dollars ($2,000,000) in respect of property damaged or destroyed, (ii) fire and extended coverage insurance covering all alterations, additions, partitions, improvements made or placed by Tenant in the Premises, and contents placed by Tenant in the Premises naming Landlord as an additional insured as Landlord's interest may appear, all such policies to be written by insurance companies satisfactory to Landlord, (iii) workers compensation insurance, as required to meet the applicable laws of the State of Missouri, and (iv) such other commercial insurance as is customarily carried by tenants (excluding specifically any key man life insurance), as Landlord may require from time to time. Tenant agrees to have such insurance policies endorsed to provide for a waiver of subrogation against Landlord by the insurance carrier. Tenant shall obtain a written obligation on the part of each insurance company to notify Landlord at least ten (10) days prior to cancellation of such insurance. Such policies or duly executed certificates of insurance shall be promptly delivered to Landlord and renewals thereof as required shall be delivered to Landlord at least thirty (30) days prior to the expiration of the respective policy terms. Tenant's failure to comply with the foregoing requirements relating to insurance shall constitute an event of default hereunder. In addition to the remedies provided in Article XVIII of this Lease, Landlord may, but is not obligated to, obtain such insurance and Tenant shall pay to Landlord upon demand as additional rental the premium cost thereof plus interest thereon at the rate equal to the lesser of the highest rate permitted by law or eighteen percent (18%) per annum from the date of payment by Landlord until repaid by Tenant.

12.3    Tenant agrees to pay Tenant's Proportionate Share of Landlord's cost of property and liabilities insurance as carried by Landlord from time to time with respect to the Shopping Center, including without limitation fire and extended coverage insurance and liability insurance in such amounts as is reasonably necessary ("Insurance") and including an allowance in the amount of ten percent (10%) of the total insurance costs for Landlord's overhead and administrative costs. Landlord shall name Tenant as an additional insured on any liability policy covering Common Areas. Insurance as stated herein may include, without limitation, liability insurance for personal injury, death and property damage, insurance against fire, flood, extended coverage, theft or other casualties, fidelity bonds for personnel, insurance against liability for assault and battery, and defamation and claims for false arrest. During each month of the Lease term, Tenant shall make a monthly escrow deposit with Landlord equal to 1/12 of Tenant's Proportionate Share of the cost of Insurance on the Shopping Center which will be due and payable for that particular year. Tenant authorizes Landlord to use the funds deposited with Landlord under this Section to pay the cost of insurance. Each Insurance Escrow Payment shall be due and payable at the same time and manner of the payment of Minimum Guaranteed Rental as provided herein. The amount of the initial monthly Insurance Escrow Payment will be that amount set out in Section 1.1 (m) above. The initial monthly Insurance Escrow Payment is based upon Tenant's Proportionate Share of the estimated Insurance on the Shopping Center for the year in question, and the monthly

- 11 -

Insurance Escrow Payment is subject to increase or decrease as determined by Landlord to reflect, in Landlord's estimation, an accurate monthly escrow of Tenant's Proportionate Share of the cost of Insurance. The Insurance Escrow Payment account of Tenant shall be reconciled annually. If Tenant's total Insurance Escrow Payments are less than Tenant's actual proportionate share of the Insurance on the Shopping Center, Landlord shall retain such excess and credit it to Tenant's Insurance Escrow Payment account.

### ARTICLE XIII. NON-LIABILITY FOR CERTAIN DAMAGES

13.1    Except for acts or omissions of Landlord and its agents, Landlord and Landlord's agents and employees shall not be liable to Tenant or any other person or entity whomsoever for any injury to person or damage to property caused by the Premises or other portions of the Shopping Center becoming out of repair or damaged or by defect in or failure of equipment, pipes or wiring, or broken glass, or by the backing up of sewers or drains, or by gas, water, steam, electricity or oil leaking, escaping or flowing into the Premises, nor shall Landlord be liable to tenant or any other person or entity whomsoever for any loss or damage that may be occasioned by or through the acts or omissions of other tenants of the Shopping Center or of any other persons or entities whomsoever, excepting only duly authorized employees and agents of Landlord with respect to intent or patent defects in the Premises or in the building of which they form a part. Landlord's liability shall not extend beyond one (1) year from the date of substantial completion of construction of the Premises, whether or not such defects are discovered within such one-year period.

### ARTICLE XIV. DAMAGE BY CASUALTY

14.1    Tenant shall give immediate written notice to Landlord of any damage caused to the Premises by fire or other Casualty.

14.2    In the event that the Premises are damaged or destroyed by fire or other casualty insurable under standard fire and extended coverage insurance and Landlord does not elect to terminate this Lease as hereinafter provided, Landlord shall proceed with reasonable diligence and at its sole cost and expense to rebuild and repair the Premises, except that Tenant shall pay Tenant's Proportionate Share of any deductible applicable under Landlord's Insurance with respect to any casualty occurring in the Shopping Center unless Tenant or another tenant or any of the Tenant Parties or any tenant is responsible for such casualty by ways of negligence or willful misconduct, in which event the responsible tenant shall pay the entire amount of the deductible upon demand. If the building in which the Premises are located shall (i) be destroyed or substantially damaged by a casualty not covered by Landlord's insurance; or (ii) be destroyed or rendered untenantable to an extent in excess of fifty percent (50%) of the first floor area by a casualty covered by Landlord's Insurance; or (iii) be damaged to such extent that the remaining term of this Lease is not sufficient to amortize the cost of reconstruction, then either Tenant or Landlord may elect to either terminate this Lease as hereinafter provided or to proceed to rebuild and repair the Premises. Should Tenant or Landlord elect to terminate this Lease it shall give written notice of such election to tenant within ninety (90) days after the occurrence of such casualty. If neither Tenant nor Landlord should elect to terminate this Lease, Landlord shall proceed with reasonable diligence and at its sole cost and expense to rebuild and repair the Premises. In the event of any damage or destruction to the Premises, Tenant shall, upon notice from Landlord, forthwith remove, at Tenant's sole cost and expense, such portion or all of Tenant's shelves, bins, machinery and other trade fixtures and all other property belonging to Tenant or Tenant's subtenants or licensees from such portion or all of the Premises as Landlord shall request.

14.3    Landlord's obligation to rebuild and repair under this Article XIV shall in any event be limited to restoring Landlord's Work as described in Exhibit C to substantially the condition in which the same existed prior to the casualty, and shall be further limited to the extent of the Insurance proceeds available to Landlord for such restoration, and Tenant agrees that promptly after completion of such work by Landlord, it will proceed with reasonable diligence and at its sole cost and expense to rebuild, repair and restore its signs, fixtures and equipment and other items of Tenant's Work as described in Exhibit C.

- 12 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

14.4  Tenant agrees that during any period of reconstruction or repair of the Premises it will continue the operation of its business within the Premises to the extent practicable. During the period from the occurrence of the casualty until Landlord's repairs are completed, the Minimum Guaranteed Rental and all other monetary obligations of Tenant shall be reduced to such extent as may be fair and reasonable under the circumstances.

14.5  Notwithstanding anything herein to the contrary in the event the holder of any indebtedness secured by a mortgage or deed of trust covering the Premises requires that the insurance proceeds be applied to such Indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is made by any such holder, whereupon all rights and obligations hereunder shall cease and terminate.

14.6  Each of Landlord and Tenant hereby releases the other from any and all responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise from any loss or damage to property caused by fire or any other perils insured in policies of insurance covering such property, even if such loss or damage shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible, including any other tenants or occupants of the Shopping Center, provided, however, that this release shall be applicable and in force and effect only to the extent that such release shall be lawful at that time and in any event only with respect to loss or damage occurring during such times as the releaser's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releaser to recover thereunder, and then only to the extent of the insurance proceeds payable under such policies. Each of Landlord and Tenant agrees that it will request its insurance carriers to include in its policies such a clause or endorsement. If extra cost shall be charged therefor, each party shall advise the other thereof and of the amount of the extra cost, and the other party, at its election, may pay the same, but shall not be obligated to do so. If such other party fails to pay such extra cost, the release provisions of this Section shall be inoperative against such other party to the extent necessary to avoid invalidation of such releaser's insurance.

## ARTICLE XV.  EMINENT DOMAIN

15.1  If more than thirty percent (30%) of the floor area of the Premises should be taken for any public or quasi-public use or purpose under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, this Lease shall terminate as of the date physical possession is taken by the condemning authority. However, consent to assign shall not be unreasonably withheld.

15.2  If less than thirty percent (30%) of the floor area of the Premises should be taken as aforesaid, this Lease shall not terminate; however, the Minimum Guaranteed Rental and other monetary obligations of the Tenant payable hereunder during the unexpired portion of this Lease shall be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority. Following such partial taking, Landlord shall make all necessary repairs or alterations within the scope of Landlord's Work as described in Exhibit C necessary to make the Premises an architectural whole.

15.3  If any part of the Common Area shall be taken as aforesaid, this Lease shall not terminate, nor shall the rental payable hereunder be reduced, except that either Landlord or Tenant may terminate this Lease if the area of the Common Area remaining following such taking plus any additional parking area provided by Landlord in reasonable proximity to the Shopping Center shall be less than eighty-five percent (85%) of the area of the Common Area immediately prior to the taking. Any election to terminate this Lease in accordance with this provision shall be evidenced by written notice of termination delivered to the other party within thirty (30) days after the date physical possession is taken by the condemning authority.

15.4  [intentionally omitted]

15.5  All compensation awarded for any taking (or the proceeds of private sale in lieu

- 13 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

thereof) of the Premises or Common Area shall be the property of Landlord and Tenant hereby assigns its interest in any such award to Landlord; provided, however, Landlord shall have no interest in any award made to Tenant for loss of business or for the taking of Tenant's fixtures and other property if a separate award for such items is made to Tenant. Tenant shall in no event be entitled to any award for the value of the unexpired term of this Lease.

## ARTICLE XVI. ASSIGNMENT AND SUBLETTING

16.1    Tenant shall be allowed to assign Lease to another party, provided such Assignee has credit and financial strength necessary to purchase and operate Tenant's business (which shall be equal to or greater than that of Tenant), subject to Landlord's approval, which shall not be unreasonably withheld, delayed or conditioned. Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's rights as to any subsequent assignments or sublettings. Any permitted subtenant or assignee must adhere to the Permitted use specified in Section 1.1 (j) herein. Notwithstanding any assignment or subletting, Tenant and any guarantor of Tenant's obligations under this Lease shall at all times remain fully and primarily responsible and liable for the payment of the rental herein specified and for compliance with all of its other obligations under this Lease. Tenant shall be permitted to assign this Lease to PLA-FIT FRANCHISE, LLC ("Franchisor"), as provided in the Planet Fitness Addendum to Lease attached hereto and made a part hereof; and provided further that Tenant shall have the right to sublet up to 300 square feet of the Premises to Franchisor to satisfy the requirements of Tenant's franchise agreement. If a sublessee or assignee does not maintain the same permitted use as specified in Section 1.1(j), then any renewal options, expansion options, right of first refual and/or exclusive use provision shall become null and void.

16.2    Tenant shall give Landlord at least sixty (60) days advance written notice of any proposed sublease or such notice to be accompanied by a copy of the proposed sublease or assignment agreement setting forth all terms of such agreement. If Tenant proposes a sublessee or assignee who does not intend to maintain the same permitted use as specified in Section 1.1(j), then Landlord shall have the right to terminate this Lease; should Landlord not elect to terminate this Lease, Landlord shall continue to have the right to disapprove same. Tenant shall pay all of Landlord's costs, charges and expenses, including attorney's fees incurred in connection with any assignment or sublease requested or made by Tenant, but in no event shall Tenant's reimbursement obligation exceed $1,000.00. Any assignment in violation of the terms of this Article shall be null and void and of no force and effect whatsoever.

16.3    Tenant shall have the right to mortgage, pledge or otherwise encumber its interest in this Lease or in the Premises, subject to Landlord's consent which shall not be unreasonably withheld, delayed or conditioned.

16.4    The term "control" as used in this Section 16.4 means the power to directly or indirectly direct or cause the direction of the management or policies of Tenant. If Tenant is a limited liability company, any transaction or series of transaction (including, without limitation, the addition, deletion, or transfer of more than fifty percent (50%), in the aggregate, of Tenant's membership interests or of the interests of any manager/member) resulting in the transfer of control of Tenant shall be deemed to be a transfer of Tenant's interest under this Lease for the purposes of Section 16.1. A transfer of less than 50% of interests in the limited liability company shall be permissible and shall not be deemed a transfer of Tenant's interest under this Lease.

16.5    In the event of the transfer and assignment by Landlord of its interest in this Lease and in the building containing the Premises to a person expressly assuming Landlord's obligations under this Lease, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of the Landlord for performance of such obligations. Any security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to such successor in interest, and Landlord shall thereby be discharged of any further obligation relating thereto.

- 14 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

**ARTICLE XVII. [INTENTIONALLY OMITTED]**

**ARTICLE XVIII. PROPERTY TAXES**

18.1    Tenant shall be liable for all taxes levied against personal property and trade fixtures placed by Tenant in the Premises. If any such taxes are levied against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal and trade fixtures placed by Tenant in the Premises and Landlord elects to pay the taxes based on such increase, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

18.2    Tenant agrees to pay Tenant's Proportionate Share of all taxes, assessments and governmental charges of any kind and nature whatsoever levied or assessed against the Shopping Center, any other charges, taxes and/or impositions now in existence or hereafter imposed by any governmental authority based upon the privilege of renting the Premises or upon the amount of rent collected therefor, including a new tax, fee, levy or assessment on rental real estate that may not now be in existence (but not income tax of the Landlord or any tax on a transfer of Landlord's interest) (all of the foregoing being hereinafter referred to as the "Taxes"). During each month of the term of this Lease, Tenant shall make a monthly Escrow deposit with Landlord equal to 1/12 of Tenant's Proportionate Share of the Taxes on the Shopping Center which will be due and payable for that particular year. Tenant authorizes Landlord to use the funds deposited with Landlord under this Section 18.2 to pay the Taxes levied or assessed against the Shopping Center. Each Tax Escrow Payment shall be due and payable at the same time and in the same manner as the time and manner of the payment of Minimum Guaranteed Rental as provided herein. The amount of the initial monthly Tax Escrow Payment is subject to increase or decrease as determined by Landlord to reflect, in Landlord's estimation, an accurate escrow of Tenant's Proportionate Share of the Taxes. The Tax Escrow Payment account of Tenant shall be reconciled annually. If the Tenant's total Tax Escrow Payments are less than Tenant's actual pro rata share of the Taxes on the Shopping Center, Tenant shall pay to Landlord upon demand the difference; if the total Tax Escrow Payments of Tenant are more than Tenant's actual pro rata share of the Taxes on the Shopping Center, Landlord shall retain such excess and credit it to Tenant's Tax Escrow Payment account.

18.3    Landlord shall have the right to employ a tax consulting firm to attempt to assure a fair Tax burden on the Shopping Center. Tenant shall pay to Landlord upon demand from time to time, as additional rent, the amount of Tenant's Proportionate Share as aforesaid of the cost (including any attorney's fees and expenses incurred upon appeal) of such service.

18.4    In addition to the payments under Section 18.2, Tenant shall pay upon demand Tenant's Proportionate Share as aforesaid of any fees, expenses and costs (including attorney's fees and expenses) incurred by Landlord in preparing and contesting any assessments, levies or tax rates applicable to the Shopping Center or portions thereof.

18.5    Any payment to be made pursuant to this Article XVIII with respect to the real estate tax year in which this Lease commences or terminates shall bear the same ratio to the payment which would be required to be made for the full tax year as that part of such tax year covered by the term of this Lease bears to a full tax year.

**ARTICLE XIX. DEFAULT BY TENANT AND REMEDIES**

19.1    The following events shall be deemed to be events of default by Tenant under this Lease:

    (1) Tenant shall fail to pay when due any installment of rental or any other payable to Landlord as herein provided and shall not cure such failure within ten (10) days after written notice thereof to Tenant.

- 15 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

(2) Tenant shall fail to comply with any term provision or covenant of this Lease, other than the payment of rental or any other amount payable to Landlord and shall not cure such failure within twenty (20) days after written notice thereof to Tenant, except such 20 day period shall be extended if Tenant is diligently pursuing such cure.

(3) Tenant or any guarantor of Tenant's obligations under this Lease shall become insolvent, or shall make as assignment for the benefit of creditors.

(4) Tenant or any guarantor of Tenant's obligations under this Lease shall file any voluntary petition in bankruptcy or for corporate reorganization or any similar relief, or if any involuntary petition in bankruptcy shall be filed against Tenant or against any guarantor of Tenant's obligations under this Lease under any federal or state bankruptcy or insolvency act and shall not have been dismissed within thirty (30) days from the filing thereof.

(5) A receiver or Trustee shall be appointed for Tenant for all or substantially all of the assets of Tenant or any guarantor of Tenant's obligations under this Lease.

(6) Tenant shall abandon or vacate any portion of the Premises.

(7) Tenant shall do or permit to be done anything which creates a lien upon the Premises which Tenant shall not discharge or bond off within twenty days.

(8) The business operated by Tenant shall be closed for failure to pay any state sales tax as required for other reason.

Upon the occurrence of any such event of default, Landlord shall have the option to pursue any one or more of the following remedies without any notice of demand whatsoever.

A. Terminate this Lease in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in rental enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, by force if necessary, without such entry constituting a trespass, eviction or forcible entry or detainer, and without being liable for prosecution or any claim of damages therefore.

B. Enter upon and take possession of the Premises and expel and permanently expel Tenant and any other person who may be occupying said Premises or any part thereof, by force if necessary, without such entry constituting a trespass, eviction or forcible entry or detainer, and without being liable for prosecution or any claim for damages therefore, with or without having terminated the Lease.

C. Do whatever Tenant is obligated to do under the terms of this Lease (and enter upon the Premises in connection therewith if necessary) without being liable for prosecution or any damages therefor, and Tenant agrees to reimburse Landlord upon demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease, plus interest thereon at the lesser of the highest rate permitted by law or eighteen percent (18%) per annum, and Tenant further agrees that Landlord shall not be liable for any damages resulting to the Tenant from such action.

D. Alter all locks and other security devices at the Premises with or without terminating this Lease. Landlord shall not be obligated to provide a key or other means of ingress to the Tenant or Tenant's agents or to provide reentry for any reason or under any circumstances whatsoever.

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

19.2    Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises by Tenant, whether by agreement or by operation of law, it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant.  No such alteration of locks or other security devices and no removal or other exercise of dominion by Landlord over the property of Tenant or others at the Premises shall be deemed unauthorized or constitute a conversion, Tenant hereby consenting, after any event of default to the aforesaid exercise of dominion over Tenant's property within the Premises.  All claims for damages by reason of such reentry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process.  Tenant agrees that any re-entry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings, and Landlord shall not be liable in trespass for otherwise.

19.3    In the event that Landlord elects to terminate the Lease by reason of an event of default, then notwithstanding such termination, Tenant shall be liable for and shall pay to Landlord at the address specified for notice to Landlord herein the sum of all rental and other amounts payable to Landlord pursuant to the terms of this Lease which have accrued to date of such termination, plus, as damages, and not as a penalty, an amount equal to the then present value of the sum of (i) the Minimum Guaranteed Rental for the remaining portion of the Lease term (had such term not been terminated by Landlord prior to the date of expiration stated in Article I and (ii) Tenant's Common Area Maintenance Charge, Insurance Escrow Payment and Tax Escrow Payment hereunder for the remaining portion of the Lease term (had such term not been terminated by Landlord prior to the date of expiration stated in Article I), less the then present reasonable rental value of the Premises for the remainder of the term (which shall be determined according to the actual rental rate at which the Premises shall have been relet if the Premises shall have been relet at the time the determination is made, or which shall be determined according to the expert opinion of the rental rate at which the Premises can be relet within a reasonable time, discounted for a reasonable vacancy factor, if the Premises shall not then have been relet).

19.4    In the event that landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord at the address specified for notice to Landlord herein all rental and other amounts payable to Landlord pursuant to the terms of this Lease which have accrued to the date of such repossession, plus total rental (including without limitation the Minimum Guaranteed Rental) plus Tenant's Common Area Maintenance Charge, Insurance Escrow Payment and Tax Escrow Payment required to be paid by Tenant to Landlord during the remainder of the Lease term until the date of expiration of the term as stated in Article I, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting expenses incurred by Landlord as provided in Section 19.5 hereof).  In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the rental herein reserved.  Actions to collect amounts due by Tenant to Landlord as provided in this Section 19.4 may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the Lease term.

19.5    In case of any event of default, Tenant shall also be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, broker's fees incurred by Landlord in connection with reletting the whole or any part of the Premises; the costs of removing and storing Tenant's or other occupant's property; the cost of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies including reasonable attorney's fees which shall be not less than fifteen percent (15%) of all sums then owing by Tenant to Landlord.

19.6    Landlord may, but need not, relet the Premises or any part thereof, upon such terms and receiving such rent as Landlord, in its sole discretion, shall determine (including the right to relet the Premises for a greater or lesser term than that remaining under this Lease, the right to relet the Premises as a part of a larger area, and the right to

- 17 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

change the character or use of the Premises). If Landlord elects to relet the Premises, it shall only be required to use the same efforts it then uses to lease other space or properties which it owns or manages; provided, however that Landlord shall not be required to give any preference or priority to the showing or leasing of the Premises over any other space that Landlord may be leasing or have available and may place a suitable prospective tenant in any such available space regardless of when such alternative space becomes available; provided further, that Landlord shall not be required to observe any instruction given by Tenant about such reletting or accept any tenant offered by Tenant unless such offered tenant has a credit worthiness acceptable to Landlord leases the entire Premises, agrees to use the Premises in a manner consistent with the Lease and leases the Premises at the same rent, for no more than the current term and on the same terms and conditions as in this Lease without any expenditure by Landlord for tenant improvements or broker's commissions. In any such case, Landlord may, but shall not be required to, make repairs, alterations and additions in or to the Premises and redecorate the same to the extent Landlord deems necessary or desirable. Tenant agrees to pay to Landlord, on demand, any deficiency that may arise by reason of such reletting for the remainder of the Lease term.

19.7    In the event Tenant is comprised of more than one person and/or entity, all such persons and/or entities shall be jointly and severally liable for all of the obligations and liabilities of Tenant under this Lease.

19.8    In the event of any default by Landlord, Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have twenty (20) days (or such longer period as may be required in the exercise of due diligence) in which to cure any such default; except, however, in an emergency situation Landlord shall immediately cure such default. Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder shall be construed as covenants, not conditions. The term "Landlord" shall mean only the owner, for the time being, of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall thereupon be released and discharged from all covenants and obligations of the Landlord thereafter accruing, but such covenants and obligations shall be binding during the Lease term upon each new owner of the duration of such owner's ownership. Notwithstanding any other provisions hereof, in the event of any breach or default by Landlord in any term or provision of this Lease, Tenant agrees to look solely to the equity or interest then owned by Landlord in the land and improvements which constitute the Shopping Center; however, in no event shall any deficiency judgment or any money judgment of any kind be sought or obtained against any party Landlord.

19.9    Subject to the rights of Tenant's lender who may have been granted a security interest in Tenant's personal property and equipment, in the event that Landlord shall have taken possession of the Premises pursuant to the authority herein granted, then Landlord shall have the right to keep in place and use all of the furniture, fixtures and equipment at the Premises, including that which owned by or leased to Tenant at all times prior to any foreclosure thereon by Landlord or repossession thereof by any lessor thereof or third party having a lien thereon. Landlord shall have the right to remove from the Premises (without the necessity of obtaining a distress warrant, writ of sequestration or other legal process and without being liable for prosecution or any claim for damages therefor) all or any portion of such furniture, fixtures, equipment and other property located thereon and place same in storage at any place within the County in which the Premises are located; and in such event, Tenant shall be liable to Landlord for costs incurred by Landlord in connection with such removal and storage and shall indemnify, defend and hold Landlord harmless from all loss, damage, cost, expense and liability in connection with such removal and storage. Landlord shall also have the right to relinquish possession of all or any portion of such furniture, fixtures, equipment and other property to any person ("Claimant") claiming to be entitled to possession thereof who presents to Landlord a copy of any instrument represented to Landlord by Claimant to have been executed by Tenant (or any predecessor of Tenant) granting Claimant the right under various circumstances to take possession of such furniture, fixtures, equipment or other property, without the necessity on the part of Landlord to inquire into the authenticity of said instrument and without the necessity of Landlord's making any nature

- 18 -

of investigation or inquiry as to the validity of the factual or legal basis upon which Claimant purports to act; and Tenant agrees to indemnify, defend and hold Landlord harmless from all cost, expense, loss, damage and liability incident to Landlord's relinquishment of possession of all or any portion of such furniture, fixtures, equipment or other property to Claimant.

19.10  In the event of any breach or threatened breach by Tenant to any covenants, agreements, terms or conditions made in this Lease, Landlord shall be entitled to enjoin such breach or threatened breach and, in addition to the rights and remedies of Landlord herein stated, shall have any and all other rights and remedies which Landlord has or may hereafter have at law or in equity, by statute or otherwise. The provisions of this Article XIX shall be construed consistent with the law of Missouri so that remedies of Landlord herein described shall be available to Landlord to the full extent but only to the extent that they are not invalid or unenforceable under the laws of Missouri. Tenant stipulates and agrees that the rights herein granted Landlord are commercially reasonable.

19.11  Landlord shall not be in default in the performance of any of its obligations under this Lease unless and until Landlord shall have failed to perform such obligation within twenty (20) days or such additional time as is reasonably required to correct such default after written notice by Tenant to Landlord stating with specificity the nature of Landlord's failure to perform such obligation; except in the event of emergency, in which case Landlord shall promptly address the emergency situation. In the event of a Landlord default, Tenant shall be entitled to exercise all rights and remedies available to it under this Lease, at law or in equity, and shall be entitled to recover costs and reasonable attorney's fees.

## ARTICLE XX. LIENS

20.1  Tenant shall have no authority , express or implied, to create or place any lien or encumbrance of any kind or nature whatsoever upon, or in any manner to bind, the interest of Landlord or Tenant in the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises on which any lien is or can be validly and legally asserted against its leasehold interest in the Premises or the improvements thereon and that it will save and hold Landlord harmless from any and all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the right, title and interest of the Landlord in the Premises or under the terms of this Lease, and shall discharge any such lien by payment or bonding within ten (10) days after filed, failing which Landlord shall have the right, but not the obligation, in addition to all other remedies, to discharge such lien at Tenant's expense and Landlord's cost thereof, plus interest thereon at the lesser of the highest rate permitted by law or eighteen percent (18%) per annum, and shall be reimbursed by Tenant upon demand as additional rental hereunder.

20.2  Tenant agrees that neither this Lease nor any memorandum or summary of this Lease shall be recorded without the prior written consent of the Landlord, which consent may be granted or withheld in such other party's sole and absolute discretion. If Tenant causes this Lease or any notice or memorandum hereof to be recorded, or otherwise files or records any  such lis pendens or other evidence, then Tenant shall be deemed to be in default of this Lease, and Tenant shall indemnify and defend Landlord and hold it harmless from any and all liability, loss, claim, demand, lien, damage, penalty, fine, interest, cost and expense (including, without limitation, reasonable attorney's fees and litigation costs) suffered or incurred by Landlord on account thereof or arising therefrom.

20.3  Landlord shall have and Tenant hereby grants to Landlord a continuing security interest for all rentals and other sums of money becoming due hereunder from Tenant, upon all goods, wares, equipment, fixtures, furniture, inventory, accounts, contract rights, chattel paper and other personal property of Tenant situated on the Premises, which is located at the address as specified in Article 1.1 (f) herein, and such property shall not be

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

removed therefrom without the consent of Landlord until all arrearages in rent as well as any and all other sums of money then due to Landlord hereunder shall first have been paid and discharged. Products of collateral are also covered. In the event of a default under this Lease, Landlord shall have, in addition to any other remedies provided herein or by law, all rights and remedies under the Uniform Commercial code, including without limitation the right to sell the property described in this paragraph at public or private sale upon five (5) days notice to Tenant of the time and place of such sale. Tenant hereby agrees to execute such other instruments as are necessary or desirable in Landlord's discretion to perfect the security interest hereby created. Any statutory lien for rent is not hereby waived, the express contractual lien herein granted being in addition and supplementary thereto. Landlord and Tenant agree that this Lease and security agreement serve as a financing statement and that a copy or photographic or other reproduction of his portion of this Lease may be filed for record by Landlord and have the same force and effect as the original. This security agreement and financing statement also covers fixtures located at the Premises described in Exhibit A attached hereto, and may be filed for record in the real estate records. Tenant warrants that the collateral subject to the security interest granted herein is not purchased or used by Tenant for personal, family or household purposes.

Notwithstanding anything to the contrary in this Section 20.3, Landlord agrees that it will subordinate its security interest and landlord's lien to the security interest of Tenant's supplier or institutional financial source, and Landlord agrees to promptly execute any subordination agreement, in form and substance reasonably satisfactory to Landlord, presented by Tenant for such purposes

## ARTICLE XXI.  HOLDING OVER

21.1    In the event Tenant remains in possession of the Premises after the expiration of this Lease with Landlord's written consent but without the execution of a new lease, it shall be deemed to be occupying said Premises as a tenant from month to month at a rental equal to the rental (including without limitation the Minimum Guaranteed Rental) herein provided plus fifty percent (50%) of such amount and otherwise subject to all the conditions, provisions and obligations of this Lease insofar as the same are applicable to a month to month tenancy. The foregoing shall not constitute Landlord's consent for Tenant to holdover.

21.2    In the event Tenant remains in possession of the Premises after the expiration of this Lease without Landlord's consent, Tenant shall pay during each day of the holdover double the rental value of the Premises (which shall be deemed to be at least equal to the Minimum Guaranteed Rental), which shall be in addition to all other rights and remedies of Landlord. Tenant shall also pay to Landlord all damages sustained by Landlord resulting from retention of possession by Tenant, including without limitation the loss of any proposed subsequent tenant for any portion of the Premises. Nothing contained in this Section shall be construed or operate as a waiver of Landlord's right of re-entry or any other right of Landlord.

## ARTICLE XXII.  SUBORDINATION

22.1    For purposes of this Article XXII, "Mortgage" shall mean any mortgage, deed of trust, ground lease, or other lien or encumbrance presently existing or hereafter created upon the Premises of the Shopping Center, or on any renewals or extensions thereof. For purposes of this Article XXII, "Lender" shall mean the holder of any Mortgage at the time in question.

22.2    Landlord represents that the Shopping Center is currently encumbered by a mortgage, deed of trust or other lien upon the premises. Landlord agrees to to obtain a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") from such encumbrancer by which Tenant subordinates its Lease to such encumbrance provided that the encumbrancer agrees to a non-disturbance of Tenant's possession so long as Tenant is not in default under this Lease in exchange for attornment by Tenant to such encumbrance, in form and substance reasonably satisfactory to all parties. Subject to non-disturbance as described above, Tenant accepts this Lease subject and subordinate to

- 20 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

any Mortgage, but Tenant agrees that any such Lender shall have the right at any time to subordinate such Mortgage to this Lease. Subject to non-disturbance of Tenant's rights under this Lease, Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any Mortgage hereafter placed upon the Premises or the Shopping Center, and Tenant agrees upon demand to execute such further instruments subordinating this Lease as Landlord may request, and upon any failure of Tenant to do so, without limitation of Landlord's remedies, Landlord shall have the right to execute same as attorney-in-fact for Tenant.

22.3    If any foreclosure or power of sale proceedings are initiated by any Lender or a deed in lieu is granted, Tenant agrees, upon written request of any such Lender or any purchaser at such sale, to attorn and pay rent to such party and to execute and deliver any instruments necessary or appropriate to evidence or effectuate such attornment. In the event of attornment, no Lender shall be: (i) liable for any act or omission of Landlord, or subject to any offsets or defenses which Tenant might have against Landlord (prior to such Lender becoming Landlord under such attornment), (ii) liable for any security deposit or bound by any prepaid rent not actually received by such Lender, or (iii) bound by any future modification of this Lease not consented to by such Lender. Any Lender may elect to make this Lease prior to the lien of its Mortgage, and if the Lender under any prior Mortgage shall require, this Lease shall be prior to any subordinate Mortgage; such elections shall be effective upon written notice to Tenant.

### ARTICLE XXIII. MERCHANT'S ASSOCIATION

23.1    Intentionally deleted.

### ARTICLE XXIV. NOTICES

24.1    Wherever any notice is required or permitted hereunder such notice shall be in writing. Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered whether actually received or not when deposited in the United States mail, postage prepaid Certified or Registered Mail, Return Receipt Requested, addressed to the parties hereto at the respective addresses set out in Section 1.1 above, or at such other addresses as they may have hereafter specified by written notice.

24.2    If and when included within the term "Landlord" as used in this instrument there is more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such notice specifying some individual at some specific address for the receipt of notices and payments to Landlord; if and when included within the term "Tenant" as used in this instrument there is more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such notice specifying some individual at some specific address for the receipt of notices and payments to Tenant. All parties, respectively, shall be bound by notices and payments given in accordance with the provisions of this Article to the same effect as if each had received such notice or payment.

### ARTICLE XXV. LATE CHARGES

25.1    In the event Tenant fails to pay to Landlord when due any installment of rental or other sum to be paid to Landlord which may become due hereunder, failure within (10) days after written notice thereof to Tenant, Landlord will incur additional expenses in an amount not readily ascertainable and which as not been elsewhere provided for between Landlord and Tenant. All Amounts (including, without limitation, the Minimum Guaranteed Rental and Tenant's Common Area Maintenance Charge, Insurance Escrow Payment and Tax Escrow Payment) owed by Tenant to Landlord pursuant to any provision of this Lease shall not be deemed a loan but shall bear interest (the "Default Rate of Interest") from the date due until paid at the annual rate equal to five percentage points in excess of the "Prime Rate" as most recently published in the Wall Street Journal, or any successor thereto, in its listing of "Money Rates", changing as and when said Prime Rate changes, unless a lesser rate shall then be the maximum rate permissible by law with respect thereto, in which event said lesser rate shall be charged. In addition

- 21 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

to the payment of interest, if Tenant should fail to pay to Landlord when due any installment of rental or other sum to be paid hereunder, Tenant will pay landlord on demand a late charge equal to the greater of (i) $100.00 or (ii) five percent (5%) of the past due amount. Failure to pay such late charge upon demand therefor shall be an event of default hereunder. Provisions for such late charge shall be in addition to all other rights and remedies available to Landlord hereunder or at law or in equity and shall not be construed as liquidated damages or limiting Landlord's remedies in any manner.

### ARTICLE XXVI. DIRECTION OF TENANTS ENERGIES

26.1    Tenant acknowledges that Tenant's monetary contribution to Landlord (in the form of rentals) and Tenant's general contribution to commerce within the Shopping Center (also important in Landlord's determination to execute this Lease with Tenant) will be substantially reduced if, during the term of this Lease, either Tenant or any person, firm or corporation, directly, or indirectly controlling, controlled by or under common control with Tenant shall directly or indirectly operate, manage, conduct or have any interest in any establishment within commercial proximity of the Shopping Center. Accordingly, Tenant agrees that during the term of this Lease neither Tenant nor any person, firm, corporation, partnership, limited liability company, or other entity, directly or indirectly controlling, controlled by or under common control with Tenant (and also, in the event Tenant is a corporation, any officer or director thereof or shareholder owning more than ten percent (10%) of the outstanding stock herefor, or parent, subsidiary or related or affiliated corporation) shall directly or indirectly operate, manage, conduct or have any interest in any commercial establishment within a radius of two and three-tenths (2.3) miles of the Shopping Center, except that any such commercial establishment existing at the date of this Lease may continue to be operated, managed, conducted and owned in the same manner as on the date of this Lease, provided there is no change in the size or trade name of such commercial establishment.

### ARTICLE XXVII. MISCELLANEOUS

27.1    Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between parties hereof, it being understood and agreed that no provisions contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant. Whenever herein the singular number is used, the same shall include the plural, and words of any gender shall include each other gender.

27.2    The captions used herein are for convenience only and do not limit or amplify the provisions hereof.

27.3    One or more waivers of any covenant, term or condition of this Lease by either party shall be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

27.4    Time is of the essence with respect to all provisions of this Lease, except that whenever a period of time is herein prescribed for action to be taken by Landlord, Landlord shall not be liable or responsible for and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of Landlord. At any time when there is outstanding a Mortgage covering Landlord's interest in the Premises, Tenant may not exercise any remedies for default by Landlord hereunder unless and until the holder of the indebtedness secured by such Mortgage shall have received written notice of such default and a reasonable time for curing such default shall thereafter have elapsed.

- 22 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

27.5    Landlord agrees that if Tenant shall perform all the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the continuance of this Lease have the peaceable and quiet enjoyment and possession of the Premises.

27.6    This Lease contains the entire agreement between the parties and no agreement shall be effective to change, modify or terminate this Lease in whole or in part unless such agreement is in writing and duly signed by the party against whom enforcement of such change, modification or termination is sought.  This Lease and the schedules and riders attached, if any, form a part of this Lease together with the rules and regulations adopted and promulgated by the Landlord pursuant to Article 6.1 hereof, and set forth all the covenants, promises, assurances, agreements, representations, conditions, warranties, statements, and understandings ("Representations") between the Landlord and the Tenant concerning the Premises and the Shopping Center, and there are no Representations, either oral or written between them other than those in this Lease.  This Lease supersedes and revokes all previous negotiations, arrangements, letters of intent, offers to lease, lease proposals, brochures, Representations, and information conveyed, whether oral or in writing, between the parties hereto or their respective representatives or any other person purporting to represent the Landlord of the Tenant.  The Tenant acknowledges that it has not been induced to enter into this Lease by any Representations not set forth in this Lease, it has not relied on any such Representations, no such Representations shall be used in the interpretation or construction of this Lease, and the Landlord shall have no liability for any consequences arising as a result of any such Representations.

27.7    Tenant warrants that, other than Cassidy Turley (to whom Landlord agrees to pay a total leasing commission equal to three percent of the gross rental contracted to be paid under this Lease), it has had no dealing with any broker or agent in connection with the negotiation or execution of this Lease, and Tenant agrees to indemnify, defend and hold Landlord harmless from and against any claims by any broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

27.8    Tenant agrees to furnish from time to time when requested by Landlord, the holder of any Mortgage covering all or any part of the Shopping Center or the improvements therein or the Premises or any interest of Landlord therein an estoppel certificate signed by Tenant confirming and containing such factual certifications and representations deemed appropriate by Landlord, the holder of any Mortgage covering all or any part of the Shopping Center or the improvements therein or the Premises or any interest of Landlord therein, and tenant shall, within five (5) days following receipt of said certificate from Landlord, return a fully executed copy thereof to Landlord.  In the event tenant shall fail to return a full executed copy of such certificate to Landlord within the foregoing five-day period, then Tenant shall be deemed to have approved and confirmed all of the terms, certifications and representations contained in such certificate.  Tenant irrevocably appoints Landlord as attorney-in-fact for the Tenant with full power and authority to execute and deliver in the name of Tenant such certificate if Tenant fails to deliver the same within such five (5) day period and such certificate as signed by Landlord shall be fully binding on Tenant.

27.9    The laws of the State in which the Premises are located shall govern the interpretation, validity, performance and enforcement of this Lease.  If any provision of this Lease should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that illegal, invalid or unenforceable, there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

27.10   The terms, provisions and covenants contained in this Lease shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors in interest and legal representatives except as otherwise herein expressly provided.

232075710.3 26482/117356 01/31/2012

27.11   Landlord reserves the right at any time to change the name by which the Shopping Center is designated.

27.12   The person(s) executing this Lease on behalf of Tenant hereby represent and warrant to Landlord that such execution has been duly authorized by all requisite action of Tenant so that upon such execution this Lease will be binding upon and enforceable against tenant in accordance with its terms.  Tenant agrees to furnish to Landlord from time to time upon request such written proof of such authorization as Landlord may reasonably request.

27.13   [intentionally omitted]

27.14   Notwithstanding anything contained in this Lease to the contrary, the obligations of Landlord under this Lease (including any actual or alleged breach or default by Landlord) do not constitute personal obligations of the individual partners, directors, officers, members or shareholders of Landlord or Landlord's members or partners, and Tenant shall not seek recourse against the individual partners, directors, officers, members or shareholders of Landlord or against Landlord's members or partners or any other persons or entities having any interest in Landlord, or any of their personal assets for satisfaction of any liability with respect to this Lease.  In addition, in consideration of the benefits accruing hereunder to Tenant and notwithstanding anything contained in this Lease to the contrary, Tenant hereby covenants and agrees for itself and all of its successors and assigns that the liability of Landlord for its obligations under this Lease (including any liability as a result of any actual or alleged failure, breach or default hereunder by Landlord), shall be limited solely to, and Tenant's and its successors' and assigns' sole and exclusive remedy shall be against, Landlord's interest in the Shopping Center, and no other assets of Landlord.

27.15   The term "Landlord" as used in this Lease means only the owner or owners at the time being of Landlord's interest in the Shopping Center so that in the event of any assignment, conveyance or sale, once or successively, of Landlord's interest in the Shopping Center, or any assignment of this Lease by Landlord, said Landlord making such sale, conveyance or assignment shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder accruing after such conveyance, sale or assignment, and Tenant agrees to look solely to such purchaser, grantee or assignee with respect thereto.  This Lease shall not be affected by any such conveyance, assignment or sale, and Tenant agrees to attorney to the purchaser, grantee or assignee.

### ARTICLE XXVIII.  HAZARDOUS WASTE

28.1    The term "Hazardous Substances", as used in this Lease is used in its broadest sense and shall mean any substance or material defined, designated or regulated as hazardous or toxic, or other similar term (including but not limited to, asbestos, petroleum based products, pesticides, paints and solvents, polychlorinated biphenyl, lead, cyanide, DDT, acids, ammonium compounds) by any federal, state or local environmental, statute, regulation or ordinance ("Environmental Law") affecting the Premises or the Shopping Center presently in effect or that may be promulgated in the future, as such statutes, regulations and ordinances may be amended from time to time, including, but not limited to, the following statutes: (i) Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.; (ii) Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 40 U.S.C. § 1801 et seq.; (iii) Clean Air Act, 42 U.S.C. §§ 7401-7626; (iv) Water Pollution Control Act (Clean Water Act of 1977), 33 U.S.C. § 1251 et seq.; (v) Insecticide, Fungicide, and Rodenticide Act (Pesticide Act of 1987), 7 U.S.C. § 135 et seq.; (vi) Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; (vii) Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; (viii) National Environmental Policy Act (NEPA) 42 U.S.C. § 4321 et seq.; and (ix) Refuse Act of 1899, 33 U.S.C. § 407 et seq.

28.2    Tenant hereby agrees that (i) no activity will be conducted on the Premises that will produce any Hazardous substances, except for such activities that are part of the ordinary course of Tenant's business (the "Permitted Activities") provided said Permitted Activities are conducted in accordance with all Environment Laws and highest prevailing

- 24 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

standards, and that such substances shall be used and maintained only in such quantities as are reasonably necessary for such permitted use of the Premises in the ordinary course of Tenant's business therein, and further that said Permitted Activities have been approved in advance in writing by Landlord; (ii) the Premises will not be used in any manner for the storage of any Hazardous Substances except for the temporary storage of such materials that are used in the ordinary course of Tenant's business (the "Permitted Materials") provided such Permitted Materials are properly stored in a manner and location meeting all Environmental Laws, highest prevailing standards and manufactures' instructions, and that such Permitted materials are approved in advance in writing by Landlord; (iii) no portion of the Premises will be used as a landfill or a dump; (iv) Tenant will not install any underground tanks of any type; (v) Tenant will not cause any surface or subsurface conditions to exist or come into existence that constitute, or with the passage of time may constitute a public or private nuisance; (vi) Tenant will not permit any Hazardous Substances to be brought onto the Premises, except for the Permitted Materials described below, and if so brought or found located thereon, the same shall be immediately removed with proper disposal, and all required cleanup procedures shall be diligently undertaken pursuant to all Environmental Laws; (vii) for purposes of removal and disposal of any such hazardous Substances, Tenant shall be named as the owner and generator, shall obtain a waste generator identification number, and shall execute all permit applications, manifests, waste characterization documents and any other required forms. The Tenant's obligations under this Lease with respect to Hazardous Materials shall survive the termination, by lapse or otherwise, of this Lease.

28.3    (a)  Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, diminution in value of the Premises or the Shopping Center, damages for the loss or restriction on use of rentable or usable space or of any amenity of the Premises or the Shopping Center, damages arising from any adverse impact on marketing of space in the Shopping Center, and sums paid in settlement of claims, attorney's fees, consultant fees and expert fees, and all out-of-pocket expenses of each of these) which arise during or after the Term of this Lease as a result of the transportation, use, storage, maintenance, generation, disposal or release in or about the Premises or the Center of Hazardous Materials in breach of Tenant's obligations under this Lease.  This indemnification and defense of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state, or local governmental agency or political subdivision because of Hazardous Material present in, on, or about the Premises or the Shopping Center or in the soil or ground water on or under the Premises or the Shopping Center.  The foregoing indemnification and defense shall survive the terminations or expiration of this Lease.

(b)  Landlord shall indemnify, defend and hold Tenant harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, diminution in value of the Premises or the Shopping Center, and sums paid in settlement of claims, attorney's fees, consultant fees and expert fees, and all out-of-pocket expenses of each of these) which arise during or after the Term of this Lease as a result of the transportation, use, storage, maintenance, generation, disposal or release in or about the Premises or the Center of Hazardous Materials occurring prior to the date of possession of Tenant of the Premises under this Lease.  This indemnification and defense of Tenant by Landlord includes, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state, or local governmental agency or political subdivision because of Hazardous Material present in, on, or about the Premises or the Shopping Center or in the soil or ground water on or under the Premises or the Shopping Center. The foregoing indemnification and defense shall survive the terminations or expiration of this Lease.

28.4    Tenant shall promptly notify Landlord of: (i) any enforcement, cleanup or other regulatory action taken or threatened by any governmental or regulatory authority with respect to the presence of any Hazardous Material on the Premises or the migration thereof from or to other property, (ii) any demands or claims made or threatened by any party relating to any loss or injury resulting from any Hazardous Material on the

- 25 -

Premises, (iii) any release, disposal or transportation of any Hazardous Material on or from the Premises in violation of this Lease, and (iv) any matters where Tenant is required by applicable law to give a notice to any governmental or regulatory authority respecting any Hazardous Material on the Premises. Landlord shall have the right (but not the obligation) to join and participate, as a party, in any legal proceedings or actions affecting the Premises initiated in connection with any environmental, health or safety law. At such times as Landlord may reasonably request, Tenant shall provide Landlord with a written list, certified to be true and complete, identifying any Hazardous Material then used, stored, or maintained upon the Premises, the use and approximate quantity of each such material, a copy of any material safety data sheet ("MSDS") issued by the manufacturer therefor, and such other information as Landlord may reasonably require or as may be required by applicable law.

28.5    Permitted Materials shall be defined and specifically limited to the following:

_____

_____

## ARTICLE XXIX. NO OPTION

29.1    The submission of this Lease for examination does not constitute a reservation of or option for the leased Premises, and this Lease shall become effective only upon execution and delivery thereof by both parties. If lessee is a corporation, the authorized officers must sign on behalf of the corporation. The Lease must be executed for lessee, if a corporation, by the president or vice-president and be attested by the secretary or assistant secretary, unless the by-laws or resolution of the board of directors shall provide that other officers are authorized to execute the Lease, in either event, a certified copy of the by-laws or resolution, as the case may be, shall be furnished to lessor. Lessee's corporate seal must be affixed.

## ARTICLE XXX. SUITABILITY FOR INTENDED PURPOSE

30.1    Tenant and Landlord have inspected the premises for latent defects that would render the premises unsuitable for their intended commercial purposes, and Tenant and Landlord agree that, to their respective knowledge, no such defects exist. Tenant and Landlord agree that if during the Lease term any such defects arise, their mutual covenants under this agreement are and shall remain independent of each other and Tenant's covenants, including the duty to pay rent, shall not be affected by any such alleged defect.

30.2    Landlord makes no warranties other than those expressly made in this Lease, and makes no implied warranty that the Premises are suitable for any particular purpose. Tenant hereby waives the benefit of all warranties, express or implied, with respect to the Premises including, without limitation, any implied warranty that the Premises are suitable for any particular purpose.

## ARTICLE XXXI. TENANT AS FRANCHISEE

31.1    Landlord recognizes that Tenant is a franchisee of Pla-Fit Franchise, LLC ("Franchisor") and that Franchisor requires that the parties execute a Planet Fitness Addendum to Lease in form attached hereto and incorporated herein as Exhibit H (the "Franchise Lease Addendum"). Landlord agrees to execute and deliver the Franchise Lease Addendum.

31.2    This Lease is subject to the approval of Tenant's franchisor, Pla-Fit Franchise, LLC ("Franchisor"), which approval Tenant shall use good faith diligent efforts to obtain. Upon execution by Landlord and Tenant, Tenant shall expeditiously submit the executed

Lease to Franchisor for its approval. If Tenant shall fail to provide Landlord with a written approval letter from Franchisor within twenty-five (25) days after this Lease has been executed, then either party may terminate this Lease upon written notice to the other.

## ARTICLE XXXII. LETTER OF CREDIT

As additional security for performance of Tenant's obligations, for a period of the first five years of the Lease, Tenant shall provide a Letter of Credit in the initial amount of $100,000.00. The amount of the Letter of Credit shall be reduced annually by $20,000.00 on the anniversary date of the Lease, and shall expire at the end of the 5th year of the Lease. The Letter of Credit shall be posted at the time Landlord delivers possession to Tenant.

IN WITNESS WHEREOF, the parties have signed this Lease.

EXECUTED BY LANDLORD, this $1st$ day of February 2012.

LANDLORD:

By: _____
Signature

_____
Title  Manager

EXECUTED BY TENANT, this $31st$ day of January 2012.

TENANT: PF at South Grand, LLC

_____      _____

_____      _____

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

Exhibit "A"



Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

Exhibit "B"



202075710.3 25482/117356 01/31/2012

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

Exhibit "C"

Plans and specifications for Tenant work must be submitted to the Landlord within (45) days of execution of this Lease agreement. All such Tenant's work shall be subject to Landlord's approval and acceptance.

I. **DELIVERY CONDITIONS OF PREMISES:**

1. Landlord shall be responsible for any asbestos and toxic substance abatement, including the survey, rest and abate as necessary in order to furnish Tenant with documentation certifying Premises is free from any asbestos or other toxic substances..

2. Premises to be fully separated and demised from all other adjacent uses. All separation/demising walls are to be fire rated as required by the PAUCC. Re-use of existing walls shall be permitted if construction complies with code requirements. All separation/demising walls are to be insulated full height with blow-in insulation or equivalent, and skim coated if required to achieve a level 4 finish, paint ready.

3. Premises shall be fully open and cleared of any previous tenant improvements, including but limited to the removal of all drop or hung ceilings, all partition walls, all built-ins, fixtures and furnishing, all existing equipment, and wall finishes, except that the drop ceiling in the front of the space shall remain as is. Tennant shall provide a Demo plan upon request.

4. There is a terrazzo floor under the existing vinyl floor which shall remain. However, the existing floor is to be delivered as is, provided that after the removal of the existing equipment that the floors are clean, smooth and existing tile is not damaged or loose and ready for rubber or resilient The Landlord agrees level the floor as needed if depressions exist.

5. The North Exterior wall will be delivered as is with any required repairs to the existing North wall to be made at Landlord's expense. All other exterior walls and all perimeter columns are to be furred with 3- 5/8" metal studs @ 16" O.C.

6. All existing non-perimeter columns will be delivered as is. –

7. Landlord shall remove any existing abandoned roof equipment and patch existing deck and roof as required at any openings. Landlord is to repair or replace existing damaged roof decking as required throughout Premises. The Landlord takes full responsibility of leaks and repairs to the roof membrane for the duration of the lease with Tenant. The exposed roof structure is to be of non-combustible materials from Premises including, but not limited to PVC, Romex wiring,. The exposed roof decking and framing shall be prepared as required for a paint finish.

8. Landlord shall ensure that roof deck is well insulated and has an R-value to meet local building and energy code standards. Landlord does not know the rating or type on the current insulation.

9. [intentionally deleted]

10. Landlord shall provide ADA parking spaces on the property and a clear and discernable ADA accessible route to the front entrance of Premises. Landlord will provide, parking lot line striping and ADA parking signage, sidewalks, ramps and handrails as required. Tenant shall require a minimum of 4 ADA accessible parking spaces. Parking lot to have proper drainage and no standing puddles. Landlord shall install a separate meter for all exterior lighting, the billing shall be included as a CAM item. Landlord understands that tenant has never seen the parking lot lighting at night and agrees to add additional parking lot lighting if necessary within the lighting regulations of the City of St Louis.

11. Landlord shall provide professional store front at a minimum of 50 feet and vestibule with continuous glass off of the floor at 8 feet high above finished floor. The glass shall allow for views into the premises from the front of the building. The existing store front glass is acceptable as is.

12. [intentionally deleted]

13. Tenant has provided sketches of the exterior signage required to the Landlord which may or may not fit in the space being allocated to the tenant. The tenant agrees to provide more detailed drawings to the landlord at which time they shall decide together if any alteration to the exterior shall be necessary. Landlord agrees to contribute up to $5,000.00 for improvements or alterations necessary to accommodate the sign and logo.

II. **HVAC & UTILITIES CONDITIONS:**

1. Landlord shall furnish and install Roof Top Units (RTU's), for a total capacity of 4 tons per 1,000 square feet, and provide a fully functional HVAC system per Tenant's plans in good working order. The HVAC system shall include packaged roof top equipment, controls and ducted air distribution.

- 30 -

302076710.3 26462/117356 01/31/2012

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

Landlord agrees that two 40 ton units shall be dedicated to the tenant's use. The landlord shall provide the duct work necessary through any portion of the demised space and/or walls so as to make the unit/units function properly. Tenant shall be responsible for duct work adjustments within its space.

2.   Electric: Landlord shall provide 1200 amp at 120/208 of electrical service, to electric room within Premises. Landlord will provide a separate meter, split the existing 2000 amp service in the basement, and provide an additional panel on the wall within the tenant's space in order to reach 1200 amps.

3.   Water:  Landlord shall provide a 2-inch fresh water line. The Landlord agrees to Sub-Meter the existing 3 inch water line.

4.   Sewer:  Landlord shall provide a 4-inch sewer line. All lines shall be cleaned prior to acceptance of space.

5.   Gas:   Landlord shall provide gas service; separate meter and line sufficient for Tenant's demand load with a minimum 3" line to roof top and gas line run to service RTU's.

6.   Fire Sprinklers:   Landlord shall provide Primary service line, back flow preventer, inspectors test drain and overflow, post indicator valve, gauges and valves system, to include riser and primary distribution to meet code requirements. Landlord's to provide code compliant sprinkler heads pointing up to accommodate Tenant's space and have the main distribution line tight to the bottom of the bar joist, and said lines shall meet the required systemic standards.  Tenant to modify existing system at Tenant's expense.  Should Landlord use any portions of the existing Primary service or other piping, then Landlord shall provide proof that the Fire Marshall has accepted such piping prior to the Tenant's acceptance of the space. Further, should such piping be deemed unacceptable by any government permitting or regulatory agency (Fire Marshall, City of St. Louis, etc.), then Landlord will be responsible all necessary repairs. Tenant acknowledges that the riser servicing the Premises may be located outside the Premises and the riser may be servicing other tenants. Fire Alarm System to be provided as required by municipal codes and to be monitored by Landlord's central panel, Landlord to include conduit, wiring and monitoring equipment as necessary.  Tenant will install remainder of fire sprinkler system from backside of shut-off valve. The Fire Sprinklers are accepted as is provided that they meet the current fire code.

## III. TENANT IMPROVEMENT:

The cost for all Tenant provided finishes and construction, all work not delineated as "Landlord's work" or any increase in cost resulting from subsequent change shall be the responsibility of and paid for by the Tenant.

End

312075710.3 26482/117356 01/31/2012

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

**EXHIBIT D to Lease Agreement**
**Rules and Regulations to Use of the Common Area**

The use of the Common Area by Tenant and Tenant's agents, employees, servants, visitors and invitees shall be subject to the following rules and regulations:

(1) Landlord shall have the right and authority to designate specific areas within the Shopping Center or in reasonable proximity thereto in which automobiles and other transportation vehicles owned by Tenant, Tenant's employees, servants, agents, licensees and concessionaires shall be parked. Tenant shall furnish to Landlord upon request a complete list of all license numbers of all automobiles and other transportation vehicles operated by Tenant, Tenant's employees, servants, agents, licensees or concessionaires.

(2) All loading and unloading of goods shall be done only at such times, in the areas and through the entrances as shall be designated from time to time for such purposes by Landlord.

(3) The delivery or shipping of merchandise, supplies and fixtures to and from the Premises shall be subject to such rules and regulations as in the sole discretion of Landlord shall be necessary for the proper operation of the Shopping Center.

(4) No person shall use any utility area, truck facility or other area reserved for use in connection with the conduct of business except for the specific purpose for which such area is designed.

(5) Except as permitted in a Tenant's lease of the Premises or except as permitted by Landlord's prior written consent, no person shall within the Common Area:

    (a) Vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever;

    (b) Exhibit any sign, placard, banner, notice or other written material;

    (c) Distribute any circular, booklet, handbill, placard or other materials;

    (d) Solicit membership in any organization, group or association or contribution, for any purpose;

    (e) Parade, patrol, picket, demonstrate or engage in any conduct that might tend to interfere with or impede the use of the Common Area by Landlord or any occupant or any employee, or invitee of any occupant of the Shopping Center, create a disturbance, attract attention or harass, annoy, disparage, or be detrimental to the interests of any business establishments within the Shopping Center;

    (f) Use the Common Area for any purpose when none of the business establishments within the Shopping Center is open for business or employment;

    (g) Throw, discard or deposit any paper, glass or extraneous matter of any kind, except in designated receptacles, or create litter or hazards of any kind (Tenant agrees to crush boxes and deposit in trash container);

    (h) Deface, damage or demolish any sign, light standard or fixture, landscaping material or other improvements within, or property situated within the Common Area or the Shopping Center; and

    (i) Solicit any other business or display any merchandise.

(6) The common Area plumbing facilities shall not be used for any purpose other than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage or damage resulting from a violation of this provision, shall be borne by Tenant, who shall,

- 32 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

or whose employees, agents or invitees shall have caused it.

(7) All floor area, including vestibules, entrances and exits, doors, fixtures, windows and plate glass shall be maintained in a safe, neat and clean condition.

(8) No portion of the Common Area or the Shopping Center shall be used for any lodging or illegal purposes.

(9) The sidewalks, exits, entrances, of the common Area or the Shopping Center shall not be obstructed by any Tenant or used by any Tenant for any purpose other than for ingress to and egress from their respective Premises. No Tenant and no employee or invitees of any Tenant shall go upon the roof of any building in the Shopping Center except for the sole purpose of servicing its air conditioning units or rooftop equipment.

(10) In the case of any invasion, mob, riot, public excitement or other circumstances rendering such action advisable in Landlord's sole discretion, Landlord reserves the right to prevent access to the Common Area and Shopping Center during the continuance of the same by such action as Landlord may deem appropriate, including closing entrances to the Shopping Center and Common Area.

(11) No Tenant shall place or permit any radio or television antenna, loudspeaker, amplifier or other device in the Common Area or where the same can be seen or heard in the common Area without the prior written consent of Landlord.

(12) No person shall use any part of the Common Area for any purposes other than those for which the common Area is intended.

(13) No part of the Common Area shall be used for storing or maintaining any material or property, whether on a temporary basis or otherwise.

(14) Any repairs, maintenance or replacements to the Common Area required to be made by Landlord which are occasioned by the act of negligence of the Tenant, its agents, employees, sub-tenants, licensees and concessionaires, shall be paid for by the Tenant upon demand to the extent not covered by insurance proceeds paid to Landlord therefor.

(15) No Tenant shall make any alteration, addition or improvement to or remove any portion of the Common Area, and no Tenant shall make any changes to or paint any portion of the Common Area, or install any lighting, decorations or paintings in or to the Common Area, or erect or install any signs, banners, placards, decorations or advertising media of any type in the Common Area.

(16) Landlord may waive any one or more of these rules and regulations for the benefit of any particular tenant or lessee, but no such waiver by Landlord shall be construed as a waiver of such rules and regulations in favor of any other tenant or lessee, nor prevent Landlord from thereafter enforcing any such rules and regulations against any or all other the tenants of the Shopping Center.

Landlord shall at all times have the right to change these rules and regulations or to promulgate other rules and regulations in such manner as may be deemed advisable for safety, care, or cleanliness of the Shopping Center, for preservation of good order therein, or for other purposes, all of which rules and regulations, changes and amendments shall be carried out and observed by Tenant. Tenant shall further be responsible for the compliance with these rules and regulations by the employees, servants, agents, visitors and invitees of Tenant. In the event any provisions of these rules and regulations shall conflict with any specific provisions of the Lease Agreement to which this Exhibit D is attached, the provisions of the Lease Agreement shall control.

(INITIAL)

Landlord          Tenant

-3-

342076710.420767102 25482/117366 42/30/304101/27/2012

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

**EXHIBIT E To Lease Agreement**
Cost of Operation and Maintenance of the Common Area

The cost of operation and maintenance of the Common Area shall include, but shall not be limited to all costs and expenses incurred by Landlord in operating, maintaining, repairing, lighting, signing, cleaning, painting, striping, insuring, equipping, staffing, heating and cooling, accruing, and policing of the Common Area including among other costs all costs and expenses for or associated with the following (which may be incurred by Landlord in its sole discretion):

(1) Security services, patrol services and fire protection;

(2) Maintenance of sprinkler systems (both fire and irrigation) serving the shopping Center and /or Common Area;

(3) Regulation or direction of traffic;

(4) Repair or replacement, cleaning, sweeping, painting, striping and repaving of asphalt parking areas and concrete parking area, curbs, walkways, pipe bollards, guardrails, bumpers, fences, flagpoles, bicycle racks, signs and other markers, landscaping, drainage pipes, ducts, conduits and similar items, and lighting facilities;

(5) Planting, replanting and replacing flowers, trees, shrubbery, planters and other landscaping items and materials;

(6) Maintenance, repair and replacement of utility systems serving the Common Area, including, but not limited to trash, water, sanitary sewer and storm water linen and drainage systems, electrical, gas, telephone and lighting systems (including bulbs, ballasts, poles, and fixtures) and other utility lines, pipes and conduits, including utility charges in connection with any of the foregoing systems;

(7) All licenses and permit fees and surcharges that may result from any law, rule, regulation, guideline or order;

(8) Lighting and power to the Common Areas;

(9) Water services, if any, furnished by Landlord for the non-exclusive use of all tenants and their guest and invitees;

(10) Removal of snow, ice, trash and debris;

(11) Installing, renting, maintaining and operating signs of all types;

(12) All materials, supplies and services purchased or hired in the operation of the Common Area or for the purposes set forth in this Exhibit E;

(13) Inspecting, maintenance, repair and acquisition costs (including depreciation) of any and all machinery and equipment used in the operation and maintenance of the Common Area or for any of the purposes set forth in this Exhibit E, including personal property taxes and other charges and taxes incurred in connection with such equipment.

(14) Any and all personnel, including without limitation, security and maintenance people, secretaries, bookkeepers and any other personnel related to the operation of the Common Area or for the purposes set forth in this Exhibit E;

(15) Assessments levied against the Shopping Center by any community association or otherwise under any applicable restrictive covenants or the like covering the Shopping Center and other property within any developmental complex; and Provided there should be no duplication of costs in this Exhibit E with any costs Tenant is responsible to pay in other provisions of the Lease Agreement to which this Exhibit is attached.

(16) Notwithstanding anything to the contrary contained herein, any expenditures for improvements or alterations which are capital in nature shall not be included as part of the cost of operation and maintenance of the Common Areas.

- 34 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

(Initial)

Landlord          Tenant

352075710.12075710.2 25482/117356 12/28/201101/27/2012

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

**EXHIBIT F**
**SIGN CRITERIA**

The following sign criteria has been established to assist tenants in complying with their lease.  These basic standards have been made to govern the design, fabrication and installation of tenant signs and intended to afford all tenants with good visual identification, both day and night and to protect against poorly designed and badly proportioned signing.

The sign standards have been selected to harmonize with and complement the building materials and will assist in creating the proper atmosphere for the center.

This criteria should be given to your sign company to serve as a guide in preparing their design and cost estimates for your approval.

Please inform your sign fabricator that he must submit two copies of his detailed, scaled sign drawings to the office of the Center's leasing and management agent: South Grand, L.L.C., 1000 Columbia Centre Columbia IL, 62236, (Attn:  Joe Koppeis) telephone (618) 281-6300, for approval prior to fabrication of your sign.

You will be held liable and shall bear all costs for removal and/or correction of signs, sign installation and damage to the building by sign installations that do not conform with the following specifications:

**SPECIFICATIONS**

1.  All signs are to be in the form of individual face channel. Letters, illuminated with neon tubing with plastic letter faces.

2.  Letter height:  One horizontal line of lettering not to exceed 30" in height.  If, upon Landlord's determination, more than one horizontal line of lettering is necessary to provide adequate signage, Landlord, will allow Tenant to use two horizontal lines of Lettering not to exceed 36" height. The smallest letter size allowable 6" in height.

3.  Letter spread:  Not to exceed length of 75% of storefront (example: a storefront measuring 40" can have a sign length not to exceed 30").

4.  Lettering style:  Shall be approved by Landlord.

5.  Letter depth:  returns 5 1/2", color to be anodized dark bronze.

6.  Materials of Construction:

   a.  Metal portions of letters to match returns.
   b.  Plastic letter faces of Plexiglas #2415 ,Red.
   c.  Face retainers of 1" trimcap to match returns.
   d.  Neon tubing of clear red.
   e.  Inside of channel letters to be painted gloss white.

7.  All letters will be attached to a 7" wide and 7" deep raceway painted Benjamin Moore #909 or equivalent (beige), and shall exhibit no visible means of attachment between letters and shall fully conceal all wiring and ballast.  The raceway shall be constructed from .090 gauge aluminum.

8.  Emblems or Logos: may be used in conjunction with the sign letters upon prior written consent of Landlord.  Such emblems or logos are not to be box signs, but in a contour form and dimensions with the limits as stated herein, i.e. 22" height maximum, and conform with materials specified.

9.  Placement:  Letters shall center vertically on exposed plaster ban, and left and right on lease frontage.

- 36 -

10. Quantity of Signs:  One sign per Tenant storefront.

11.  All Tenants shall strictly adhere to the sign ordinance of the City of St. Louis, Missouri.

12. Secondary Signs:

    a.  No secondary exterior signs are to be placed on building wall elevations. Landlord will allow letters not to exceed 5" to be placed on the rear door for identification purposes.
    b.  No sandwich or easel/portable signs are allowed.
    c.  No window signs are permitted without the express approval of the Landlord.
    d.  Standard address numerals for postal identification of premise will be permitted.  Numeral height shall not exceed 5".

AS PREVIOUSLY STATED, SCALED DRAWINGS IN DUPLICATE, INDICATING ALL COPY, MATERIALS OF CONSTRUCTION, LETTER STYLE, COLORS, ARE TO BE SUBMITTED TO THE LANDLORD FOR APPROVAL PRIOR TO FABRICATION.

    13.    Insurance:  Sign installer must provide Landlord with a certificate of insurance showing General Liability Coverage with limits of not less than $1,000,000 per occurrence/$2,000,000 aggregate as well as proof of Worker's Compensation insurance. The Certificate must also name South Grand, L.L.C. as additional insured.

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

**Exhibit "G"**

**[intentionally omitted]**

382075710.3 25482/117356 01/31/2012

Exhibit H
PLANET FITNESS ADDENDUM TO LEASE

This addendum ("Addendum") is attached to and made a part of that certain Shopping Center Lease by and between PF at South Grand, LLC, d/b/a Planet Fitness ("Franchisee") and _____ ("Landlord") as an addendum to the lease (as amended, renewed, and/or extended from time to time, "the Lease") for the premises located in the _____ Shopping Center located at _____, Missouri _____ (the "Location").

WHEREAS, Franchisee has executed or intends to execute a Franchise Agreement with Pla-Fit Franchise, LLC ("Franchisor") for the operation of a PLANET FITNESS® business ("Business") at the Location, and as a requirement thereof, the lease for the Location must contain the provisions contained in this Addendum; and

WHEREAS, Landlord and Franchisee agree that the terms contained herein shall supersede any terms to the contrary set forth in the Lease;

NOW THEREFORE, in consideration of mutual covenants set forth herein, the execution and delivery of the Lease, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Franchisee hereby agree as follows:

1.      Landlord shall deliver to Franchisor a copy of any notice of default or termination of the Lease at the same time such notice is delivered to Franchisee.

2.      Franchisee hereby assigns to Franchisor, with Landlord's irrevocable and unconditional consent, all of Franchisee's rights, title and interest to and under the Lease upon any termination or non-renewal of the Franchise Agreement, but no such assignment shall be effective unless: (a) the Franchise Agreement is terminated or expires without renewal; and (b) Franchisor notifies the Franchisee and Landlord in writing that Franchisor assumes Franchisee's obligations under the Lease.

3.      Franchisor shall have the right, but not the obligation, upon giving written notice of its election to Franchisee and Landlord, to cure any breach of the Lease and, if so stated in the notice, to also succeed to Franchisee's rights, title and interests thereunder.

4.      The Lease may not be modified, amended, renewed, extended or assigned by Franchisee without Franchisor's prior written consent.

5.      Franchisee and Landlord acknowledge and agree that Franchisor shall have no liability or obligation whatsoever under the Lease unless and until Franchisor assumes the Lease in writing pursuant to Article 2 or 3 above.

6.      If Franchisor assumes the lease as provided for in Section 2 or 3 above, Landord and Franchisee agree that (i) Franchisee will remain liable for the responsibilities and obligations, including amounts owed to Landlord, prior to the date of assignment and assumption, and (ii) Franchisor will have the right to sublease the Premises to another franchisee, provided the franchisee agrees to operate the Location as a PLANET FITNESS business pursuant to a Franchise Agreement with Franchisor.  Franchisor will be responsible for the lease obligations incurred after the effective date of the assignment.

7.      Landlord and Franchisee hereby acknowledge that Franchisee has agreed under the Franchise Agreement that Franchisor and its employees or agents shall have

- 39 -

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

the right to enter the Location for certain purposes. Landlord hereby agrees not to interfere with or prevent such entry by Franchisor, its employees or agents. Landlord and Franchisee hereby further acknowledge that in the event the Franchise Agreement expires (without renewal) or is terminated, Franchisee is obligated to take certain steps under the Franchise Agreement to de-identify the location as a PLANET FITNESS business. Landlord agrees to permit Franchisor, its employees or agents, to enter the Location and remove signs, decor and materials displaying any marks, designs or logos owned by Franchisor, provided Franchisor shall bear the expense of repairing any damage to the Location as a result thereof.

8.    Landlord agrees to allow Franchisee to remodel, equip, paint and decorate the interior and exterior of the Location pursuant to the terms of the Franchise Agreement and any successor Franchise Agreement under which Franchisee may operate the Business at the Location.

9.    Copies of any and all notices required or permitted hereby or by the Lease shall also be sent to Franchisor at _____, Attn: Chief Legal Officer, or such other address as Franchisor shall specify by written notice to Landlord.

10.   Under the Franchise Agreement, any lease for the location of a PLANET FITNESS business is subject to Franchisor's approval. Accordingly, the Lease is contingent upon such approval.

11.   Franchisor is a third party beneficiary under this Addendum.

12.   References to the Lease and the Franchise Agreement include all amendments, addenda, extensions and renewals to such documents.

13.   References to the Landlord, Franchisee and Franchisor include the successors and assigns of each of the parties.

**[SIGNATURE PAGE FOLLOWS]**

- 40 -

WITNESS the execution hereof.
**FRANCHISEE:**                                **PF AT SOUTH GRAND, LLC, d/b/a Planet Fitness**

By: _____

Name: _Dorob E. Corjki_____

Title: _Vice President_____

Date of Signature _31 Jan 2012_____


**LANDLORD:**

By: _____

Name: _Joseph I GKonplers_____

Title: _Manager_____

Date of Signature _February 1, 2012_____

422076740.12075710.2 25482/117358 12/23/201401/27/2012

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM



**Exhibit "I"**
**Tenant's Approved Signage**



EXHIBIT H

Planet Fitness Dietrich Meadows Shopping Center

St. Louis, MO          1.7.11

DKMullin Architects

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

Exhibit "I", continued

Exhibit "I"



2122-CC01059

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

## FIRST AMENDMENT OF LEASE

**FIRST AMENDMENT OF LEASE** (this "First Amendment") is made this **28** day of *August*____, 2012 by and between **SOUTH GRAND, LLC** (the "Landlord"), and **PF AT SOUTH GRAND, LLC** (the "Tenant").

WHEREAS, Landlord and Tenant entered into a Lease dated February 1, 2012 (the "Lease") for certain premises located at 6155 South Grand Blvd., St. Louis, MO 63111 (the "Premises").

WHEREAS, Landlord and Tenant have agreed to amend the Lease as set forth herein.

NOW, THEREFORE, for One Dollar ($1.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.     The Recitals are incorporated herein by reference.  All capitalized terms not defined herein shall have the meanings set forth in the Lease.

2.     The Lease is hereby amended as follows:

(a)     Section 1.1(i) of the Lease is hereby amended by deleting the words "TO BE DETERMINED" and inserting the date "May 24, 2012" in lieu thereof.

(b)     The first sentence of Section 3.1(a) of the Lease is hereby amended by deleting the words "within 90 days from Lease execution" and inserting the date "May 24, 2012." in lieu thereof.

(c)     Exhibit "C" of the Lease is hereby amended by adding to such Exhibit "C" the provisions of Exhibit "C-1" attached hereto and incorporated by reference herein, it being agreed and understood that "Landlord's Work" as described in the Lease and in Exhibit "C" shall include the work described in Exhibit "C-1" attached hereto and incorporated by reference herein.

(d)     Section 3.1(b) of the Lease is hereby amended by adding the following provisions at the end of such section:

The parties acknowledge that Tenant needs to gain access to the Premises so that it can begin its improvements and be able to open for business before the end of December 2012.  The parties agree that Landlord has completed some work, but work to be done by Landlord as described in Exhibit C-1 has not yet been completed and that the Premises is not Ready for Occupancy as described in Section 3.1(b) of the Lease.  Notwithstanding the incompletion of Landlord's work on Exhibit C-1, the parties agree that Tenant may take possession of the Premises to commence its improvements and that Landlord will complete the work on Exhibit C-1 as quickly as feasible and as outlined on Exhibit C-1.  At such time as the work on Exhibit C-1 is complete, the parties shall execute a document acknowledging completion of Landlord's work so that the "Commencement Date" can be established.

3.     The Lease, as modified herein, remains in full force and effect, and except as modified herein, has not been assigned, modified, supplemented or amended in any way.

1

2311639.1 25482/117356 07/25/2012

```
┌─────────────────┐
│     EXHIBIT     │
│  tabbies        │
│       2         │
└─────────────────┘
```

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

4.    The Lease, as modified herein, represents the entire agreement between the parties with respect to the Premises.  To the extent of a conflict between the terms of the Lease and this First Amendment, this First Amendment shall control.

5.    This First Amendment may be executed in multiple counterparts, each of which when taken together, shall constitute an original.

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be executed under seal as of the date first set forth above.

WITNESS                                LANDLORD:

                                       SOUTH GRAND, LLC

_____                  By: _____ (SEAL)
                                       Name: Joseph G Koppeis
                                       Title: Manager

                                       TENANT:

                                       PF AT SOUTH GRAND, LLC

_____                  By: _____ (SEAL)
                                       Name: THOMAS E. CARSICI
                                       Title: MABA PARTNER

2

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

<u>Exhibit "C-1"</u>

<u>DEMISING WALL:</u> To be installed by LLD not later than
10-1-2012 or the LLD agrees to pay BBi Constructors in the amount of $13,398.00 to
complete the wall (with BBi work coordinated with Tenant's improvement schedule).
Both parties agree that this wall is critical and will likely be the first item to be completed
in the Tenants Improvement schedule.

<u>FRONT DOOR:</u> To be installed on opposite side by LLD not later than 10-1-2011

<u>REAR EXTERIOR WALL:</u>  Exterior rear wall to be repainted by LLD by 10-1-2012

<u>FLOORING:</u> The LLD agrees that the floor area in front of the rear electrical panels does
not meet the "smooth surface ready for rubber flooring" requirement in Exhibit "C" of
the lease. The LLD agrees to repair the floor area in question to meet the requirement by
10-1-2012 or pay BBi Constructors an amount that shall not exceed $5,000.00 to
complete the repair which shall be coordinated with the tenant's improvement schedule.

<u>VESTIBULE:</u> The LLD agrees that Item 11 of Exhibit "C" does refer to a vestibule being
provided the landlord.
Both Tennant and LLD agree that the improvement
will be made inside the space or by enclosing the existing opening in the front exterior
wall leading into the space. The LLD agrees to install the item by 10-1-2012 or pay BBi
Constructors in the amount of
$7500.00 to complete the item (with BBi work coordinated with Tenant's improvement
schedule).

3

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

## MEMORANDUM OF COMMENCEMENT DATE OF LEASE

MEMORANDUM OF COMMENCEMENT DATE OF LEASE (this "Memorandum") is made as of the 21st day of December, 2012 by and between SOUTH GRAND, LLC (the "Landlord"), and PF AT SOUTH GRAND, LLC (the "Tenant").

WHEREAS, Landlord and Tenant entered into a Lease dated February 1, 2012 (the "Lease") for certain premises located at 6155 South Grand Blvd., St. Louis, MO 63111 (the "Premises"), as amended by a First Amendment of Lease, dated August 28, 2012 (the "First Amendment").

WHEREAS, pursuant to the Lease, Landlord and Tenant desire to confirm the Commencement Date of Lease; and the parties also desire to confirm a credit to Tenant for Tenant's payment of an improvement expense that was to be borne by Landlord.

NOW, THEREFORE, for One Dollar ($1.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1. Commencement Date. The parties acknowledge that the Commencement Date of the Lease is December 21, 2012 and, accordingly, the expiration of the initial Lease Term is December 31, 2022. A copy of the Certificate of Occupancy dated December 21, 2012 is attached as Exhibit "A".

2. Tenant Credit. Pursuant to the provisions of Exhibit C-1 of the First Amendment, Landlord agreed to pay up to $5,000 for flooring repairs to make the floor "smooth surface ready for rubber flooring." The parties acknowledge that Tenant, not the Landlord, has paid the flooring contractor the sum of $ $ 4,741.00 for the performance of such work (the "Floor Payment"). Landlord and Tenant agree that Tenant shall be entitled to a credit and deduction of the Floor Payment against the first Monthly Payment of Rent due under the Lease.

3. This Memorandum may be executed in multiple counterparts, each of which when taken together, shall constitute an original.

IN WITNESS WHEREOF, the parties hereto have caused this Memorandum to be executed under seal as of the date first set forth above.

1

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

WITNESS

LANDLORD:

SOUTH GRAND, LLC

By: _____ (SEAL)
Name: Joseph G. Koppeis
Title: Manager

TENANT:

PF AT SOUTH GRAND, LLC

By: _____ (SEAL)
Name: THOMAS E. CARSKI
Title: MANG. PARTNER

2

2803541.1 26482/117356 02/08/2013

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

Exhibit "A"



**Eddie Roth**
Director of Public Safety

## City of St. Louis
DEPARTMENT OF PUBLIC SAFETY
DIVISION OF BUILDING AND INSPECTION
FRANCIS G. SLAY
MAYOR



**Frank Oswald**
Acting Building Commissioner
Deputy Building Commissioner

---

CN   497546-12                                    DATE  DECEMBER 21, 2012

CERTIFICATE OF OCCUPANCY AND ZONING

THIS CERTIFIES THAT THE UNIT/PROPERTY AT

6155 S GRAND                          HAS BEEN INSPECTED BY THE DIVISION OF

BUILDING AND INSPECTION AND HAS COMPLIED WITH APPLICABLE PROVISIONS OF ST.

LOUIS CITY ORDINANCES AS AMENDED, AS PERTAINING TO ITEMS LISTED BELOW AND

MAY BE USED/OPERATED AS DESCRIBED.

USE/TYPE                          CURRENT ZONING
COMMERCIAL                        O  LOCAL COMMERCIAL AND OFFICE

OCCUPANCY LOAD -  310

USE GROUP  A3

ISSUE TO:   PLANET FITNESS

FOR USE AS FITNESS CENTER (TMT)

BUILDING COMMISSIONER

PLANET FITNESS
KEVIN CAROKI
13924 MANCHESTER
ST. LOUIS, MO 63011

---

3

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM



2122-CC01059

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

## LEASE TERMINATION AGREEMENT

THIS LEASE TERMINATION AGREEMENT (this "Agreement") is made and entered into effective as of the 25 day of September, 2019 (the "Effective Date"), by and between HOLLY HILLS REALTY, L.L.C., a Missouri limited liability company ("Landlord"), and PF AT SOUTH GRAND, LLC, a Maryland limited liability company ("Tenant").

## RECITALS:

A.       South Grand, L.L.C., successor in interest to Landlord, and Tenant are parties to that certain Standard Commercial Shopping Center Lease dated as of February 1, 2012 (the "Lease"), for certain premises comprised of approximately 20,807 square feet in the building located at 6155 South Grand Blvd., St. Louis, MO 63111 (the "Premises").

B.       Tenant has requested, and Landlord has agreed, subject to the terms and conditions hereinafter set forth, that Tenant be permitted to discontinue its business operations in the Premises and that the Lease and all rights and obligations of Landlord and Tenant thereunder be terminated as of 11:59 P.M. on January 31, 2020 (the "Termination Date").

NOW, THEREFORE, in consideration of the foregoing Recitals, the mutual agreements, covenants and promises contained in this Agreement, and other good and valuable consideration, the receipt, sufficiency and validity of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.       Incorporation of Recitals/Capitalized Terms.   The recitals set forth above are incorporated herein by reference.  Except to the extent specifically defined herein, all capitalized terms set forth in this Agreement shall have the same meanings as given them in the Lease.

2.       Termination of Lease.  Subject to Landlord's receipt of the Termination Payment (defined below), the Lease is hereby canceled and terminated as of on the Termination Date and of no further force and effect.  Except as otherwise expressly provided herein, all terms and conditions of the Lease shall remain unchanged and shall be in full force and effect until the Termination Date.

3.       Access.  Prior to the Termination Date, Tenant will permit Landlord and its agents and designees access to the Premises for the purpose of showing the Premises to potential tenants, provided that Landlord notifies Tenant in advance of such access.

4.       Surrender of Premises.  Tenant shall vacate and surrender to Landlord the Premises prior to 5:00 p.m. Central Time on the Termination Date broom clean and ordinary wear excepted; it being the agreement of the parties that Tenant's business operations may cease in the Premises up to six (6) weeks prior to the Termination Date in order to provide sufficient time for Tenant to vacate the Premises.  Tenant shall have the right to remove any and all personal property, trade fixtures, and equipment from the Premises on or prior to the Termination Date.  Any of Tenant's personal property, trade fixtures or equipment remaining in the Premises as of the Termination Date shall be deemed abandoned by Tenant and may be disposed of by Landlord without any liability to Tenant.

5.       Termination Payment.  On or prior to the Termination Date, Tenant shall pay Landlord the sum of Fifty-Five Thousand and 00/100 Dollars ($55,000.00) in good and readily

SL 3368536.5

EXHIBIT

3

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

available funds (the "Termination Payment"). Tenant shall also be responsible for paying to Landlord all Minimum Guaranteed Rental, Tenant's Common Area Maintenance Charge, Insurance Escrow Payment and Tax Escrow Payment required to be paid by Tenant to Landlord pursuant to the terms of the Lease up to and including the Termination Date.

6.      Release.  Effective as of the Termination Date, Landlord hereby releases and forever discharges Tenant and Planet Fitness Franchising, LLC and their affiliates, subsidiaries, members, officers, directors, agents, property managers, trustees, beneficiaries and employees (each, a "Tenant Party"), of and from any and all claims, acts, damages, demands, rights of action and causes of action, known or unknown, which Landlord ever had, now has, or in the future may have against any Tenant Party arising from or in any way connected with the Lease.  Effective as of the Termination Date, Tenant hereby releases and forever discharges Landlord and its members, officers, directors, agents, property managers, trustees, beneficiaries and employees (each, a "Landlord Party"), of and from any and all claims, acts, damages, demands, rights of action and causes of action, known or unknown, which Tenant ever had, now has, or in the future may have against any Landlord Party arising from or in any way connected with the Lease.  Each of Landlord and Tenant expressly waive any and all rights which it may have under any state or federal law which may limit the scope of the release contained in this Section 5.  This Agreement is made entirely as a compromise and for the purpose of terminating the Lease and settling and extinguishing the claims, acts, damages, demands, rights of action or causes of action of the parties relating to the Lease.  The release contained in this Section 5 shall not in any way be construed to include South Grand, L.L.C., Berkshire Hathaway, Jim Von Der Haar, Joseph Koppeis, or Patricia Koppeis.

7.      Representations.  Each party represents to the other that it has full power and authority to execute, deliver and perform this Agreement, such execution, delivery and performance does not violate any agreement, law or regulation by which such party is bound or subject, and that no consent, approval or authorization of any other party is necessary in connection with the authorization, execution, delivery and performance of this Agreement by the representing party.

8.      Notices.  All notices, consents, requests and demands to or upon the respective parties hereto shall be in writing, and shall be given in the manner set forth in the Lease.

9.      Brokers.  Landlord and Tenant each represent and warrant to the other that no broker, agent or finder negotiated or was involved in negotiating this Agreement.  Tenant shall hold Landlord harmless from all damages and shall indemnify Landlord for all damages paid or incurred by Landlord resulting from any claims asserted against Landlord by any brokers or agents claiming through Tenant.  Landlord shall hold Tenant harmless from all damages and shall indemnify Tenant for all damages paid or incurred by Tenant resulting from any claims asserted against Tenant by any brokers or agents claiming through Landlord.

10.     Alterations and Additions by Tenant.  All alterations, additions and improvements made to or fixtures placed in or upon the Premises, whether temporary or permanent in character, by either party shall be deemed a part of the Premises and the property of Landlord at the time made or placed upon the Premises, without compensation to Tenant; provided, however, that in connection with its surrender of the Premises pursuant to Section 4 above, Tenant shall have the right to remove those items of personal property described on Exhibit A attached hereto and incorporated herein by reference.

2

SL 3368536.5

11.     <u>Miscellaneous</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior discussions, negotiations and agreements, whether oral or written.  No amendment, alteration, cancellation or withdrawal of this Agreement shall be valid or binding unless made in writing and signed by both parties.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement, and the signature of any party to any counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart. This Agreement is governed and construed in accordance with Missouri law. Time is of the essence in this Agreement.

[SIGNATURES ON FOLLOWING PAGES.]

SL 3368536.5

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

## SIGNATURE TO LEASE TERMINATION AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

LANDLORD:

HOLLY HILLS REALTY, L.L.C.
a Missouri limited liability company

By: _Gus Boteun_
Name: _Gus Botoni_
Title: _Member_

TENANT:

PF AT SOUTH GRAND, LLC,
a Maryland limited liability company

By: _Kevin Carski_
Name: _Kevin Carski_
Title: _President_

4

SL 3368536.5

Electronically Filed - City of St. Louis - June 04, 2021 - 09:27 AM

EXHIBIT A

TENANT'S PERSONAL PROPERTY

- Exercise Equipment
- Tanning Equipment
- Red light therapy machine
- Hydrobeds
- Massage Chairs
- Computers and IT equipment
- Drinks Cooler

SL 3368536.5



# IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>MICHAEL FRANCIS STELZER | Case Number: 2122-CC01059 | Special Process Server 1 |
|---|---|---|
| Plaintiff/Petitioner:<br>HOLLY HILLS RENTALS LLC | Plaintiff's/Petitioner's Attorney/Address<br>JOHN CHRISTOPHE GRELLNER<br>8000 MARYLAND AVENUE<br>SUITE 1550<br>CLAYTON, MO 63105 | Special Process Server 2 |
| vs. | | Special Process Server 3 |
| Defendant/Respondent:<br>PF AT SOUTH GRAND LLC | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | |
| Nature of Suit:<br>CC Breach of Contract | | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: PF AT SOUTH GRAND LLC
**Alias:**

ARMSTRONG TEASDALE, LLP, REG.
7700 FORSYTH BLVD., SUITE 1800
ST. LOUIS, MO 63105

**ST LOUIS COUNTY SHERIFF**

*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

June 4, 2021

_____ Date          _____ *Thomas Kloeppinger* Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.
I certify that I have served the above summons by: (check one)
☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: _____ (name) _____ (title).
☐ other: _____

Served at _____ (address)
in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server          Signature of Sheriff or Server

Must be sworn before a notary public if not served by an authorized officer:
Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
Date          Notary Public

### Sheriff's Fees, if applicable

| Summons | $_____ |
|---|---|
| Non Est | $_____ |
| Sheriff's Deputy Salary Supplemental Surcharge | $ 10.00 |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

| 06/16/2021 | ☐ | **Jury Trial Scheduled** |
| | | **Scheduled For:** 12/13/2021;  9:00 AM ;  MICHAEL FRANCIS STELZER;  City of St. Louis |